IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 113,267

LUKE GANNON, BY HIS NEXT FRIENDS AND GUARDIANS, *et al.*,
*Appellees*,

v.

STATE OF KANSAS,
*Appellant.*

SYLLABUS BY THE COURT

1.

Whether a trial court erred in refusing to permit a party to reopen a case to introduce additional evidence is reviewed for abuse of discretion. The party asserting such an abuse bears the burden of establishing it.

2.

Injunctive relief must address future action or remedy an ongoing wrong—not wrongs already committed.

3.

Under K.S.A. 60-409(b), "judicial notice may be taken without request by a party, of . . . (4) specific facts and propositions of generalized knowledge which are capable of immediate and accurate determination by resort to easily accessible sources of indisputable accuracy." In general, a court may take judicial notice of statistics maintained in the records of a state department.

4.

The findings required by K.S.A. 2016 Supp. 60-252(a) should be sufficient to resolve the issues. They also should be adequate to advise the parties, as well as the

1

appellate court, of the reasons for the decision and the standards applied by the trial court which governed its determination and persuaded it to arrive at the decision.

5.

Whether a claim is nonjusticiable because it may be a political question is solely for the courts to decide as a matter of law by applying the factors identified in *Baker v. Carr*, 369 U.S. 186, 82 S. Ct. 691, 7 L. Ed. 2d 663 (1962).

6.

Under the facts of this case, the school districts' claims arising under Article 6 of the Kansas Constitution, *e.g.*, whether the legislature has complied with its duty, present a justiciable case or controversy because they are not political questions.

7.

While the legislature has the power and duty to create a public education financing system for grades K-12 that complies with Article 6 of the Kansas Constitution, it clearly has a myriad of choices available for complying with that duty.

8.

Because the Supreme Court is the final authority to determine adherence to constitutional standards, it has the power and duty to review legislative enactments to ensure the legislature's compliance with its duty under Article 6 of the Kansas Constitution. As the final authority, however, the court has no power to overturn a law enacted within constitutional limits, even though the law may be unwise, impolitic, or unjust.

9.

To determine legislative compliance with the adequacy requirement in Article 6, Kansas courts apply the test from *Rose v. Council for Better Educ., Inc.*, 790 S.W.2d 186

(Ky. 1989), which establishes minimal standards for providing adequate education. More specifically, the adequacy requirement is met when the public education financing system provided by the legislature for grades K-12—through structure and implementation—is reasonably calculated to have all Kansas public education students meet or exceed the standards set out in *Rose* and presently codified in K.S.A. 2016 Supp. 72-1127.

10.

Whether through structure and implementation the public education financing system for grades K-12 is reasonably calculated to have all public education students meet or exceed the *Rose* standards presents a mixed question of fact and law.

11.

When an appellate court reviews mixed questions of fact and law, it applies a bifurcated standard of review. Insofar as any of the trial court's factual findings are in dispute, the appellate court applies a substantial competent evidence standard. Substantial evidence is such legal and relevant evidence as a reasonable person might accept as sufficient to support a conclusion.

12.

In determining whether substantial competent evidence supports the trial court's findings, appellate courts must accept as true the evidence and all the reasonable inferences drawn from the evidence which support the trial court's findings and must disregard any conflicting evidence or other inferences that might be drawn from it.

13.

Under the circumstances of this case, substantial competent evidence supports the findings of the trial court, and those findings are not contradicted by the facts judicially noticed for the first time on appeal.

14.

The ultimate determination of whether the legislature is in compliance with Article 6 of the Kansas Constitution is a question of law over which an appellate court exercises unlimited review.

15.

In determining whether the adequacy requirement of Article 6 of the Kansas Constitution is being met, it is appropriate for courts to look at both the public education financing system's inputs, *e.g.*, funding, and outputs, *e.g.*, outcomes such as student achievement.

16.

Regardless of the source or amount of funding, total spending is not the touchstone for adequacy in education required by Article 6 of the Kansas Constitution.

17.

Under the facts of this case, the state's public education financing system provided by the legislature for grades K-12, through its structure and implementation, is not reasonably calculated to have all Kansas public education students meet or exceed the standards set out in *Rose v. Council for Better Educ., Inc.*, 790 S.W.2d 186 (Ky. 1989), and as presently codified in K.S.A. 2016 Supp. 72-1127.

Appeal from Shawnee District Court; FRANKLIN R. THEIS, ROBERT J. FLEMING, and JACK L. BURR, judges. Opinion filed March 2, 2017. Affirmed.

*Stephen R. McAllister*, solicitor general, argued the cause, and *Jeffrey A. Chanay*, chief deputy attorney general, *M.J. Willoughby*, assistant attorney general, *Dwight R. Carswell*, assistant solicitor general, *Bryan C. Clark*, assistant solicitor general, and *Derek Schmidt*, attorney general, were with him on the briefs for appellant State of Kansas; *Arthur S. Chalmers*, *Gaye B. Tibbets*, *Jerry D. Hawkins*, and

*Rachel E. Lomas*, of Hite, Fanning & Honeyman, LLP, of Wichita, were with him on the briefs for appellant State of Kansas.

*Alan L. Rupe*, of Lewis Brisbois Bisgaard & Smith LLP, of Wichita, argued the cause, and *Jessica L. Skladzien* and *Mark A. Kanaga*, of the same firm, and *John S. Robb*, of Somers, Robb & Robb, of Newton, were with him on the briefs for appellees.

*Per Curiam*:  This is the fourth school finance decision involving these parties and Article 6 of the Kansas Constitution, which imposes a duty on the legislature to "make suitable provision for finance of the educational interests of the state." Kan. Const. art. 6, § 6(b). The plaintiffs filed suit in 2010 asserting that the State violated this constitutional requirement by inequitable and inadequate funding of K-12 public education. A three-judge panel was appointed to hear the case pursuant to K.S.A. 2009 Supp. 72-64b03. After a 16-day bench trial that produced a 21,000-page record, the panel issued a 250-page memorandum opinion and entry of judgment. In it, the panel determined that through K.S.A. 72-6405 *et seq*. (School District Finance and Quality Performance Act or SDFQPA), the State had inequitably and inadequately funded education in violation of Article 6.

On appeal, we affirmed the panel on equity and remanded for it to make determinations in the remedial phase. While we also affirmed that Article 6 contains a public education adequacy component, we determined the panel did not apply the correct standard in concluding the State violated that constitutional requirement. *Gannon v. State*, 298 Kan. 1107, 1111, 319 P.3d 1196 (2014) (*Gannon I*). There, we interpreted Article 6, § 6(b) to include, as minimal standards of an adequate public education system, the seven educational "capacities" outlined by the Kentucky Supreme Court in *Rose v. Council for Better Educ., Inc.*, 790 S.W.2d 186, 212 (Ky. 1989), that had been essentially adopted by our legislature and codified in statute in 2005. 298 Kan. at 1170. See K.S.A. 2005 Supp. 72-1127.

While we had recognized that adequacy and equity "do not exist in isolation from each other," on later appeals from panel decisions made on remand we chose to first address its treatment of the equity issue. 298 Kan. at 1199. We accepted the parties' separate briefs on equity on September 2015 and later on the issue of adequacy. We resolved the equity issue through a series of decisions and orders followed by a special session of the legislature in June 2016 that produced additional school finance legislation and appropriations. *Gannon v. State*, 303 Kan. 682, 741-42, 368 P.3d 1024 (2016) (*Gannon II*); *Gannon v. State*, 304 Kan. 490, 372 P.3d 1181 (2016) (*Gannon III*). We ultimately held that for the 2016-2017 school year, the legislative response cured the constitutional inequities confirmed to exist in our previous decisions. Sup. Ct. Order, Case No. 113,267 (June 28, 2016).

On remand the panel was also tasked with making an adequacy determination, complete with findings, after applying the more clearly defined *Rose*-based test to the facts. 298 Kan. at 1171. We instructed that "the panel must assess whether the public education financing system provided by the legislature for grades K-12—through structure and implementation—is reasonably calculated to have all Kansas public education students meet or exceed the standards set out in *Rose* [citation omitted] and as presently codified in K.S.A. 2013 Supp. 72-1127." 298 Kan. at 1199-1200.

After our March 2014 remand via *Gannon I*, the panel issued several rulings, primarily on the existing trial record. It ultimately declared the financing under the SDFQPA to be constitutionally inadequate under the *Gannon I* test. Soon thereafter the 2015 legislature enacted the Classroom Learning Assuring Student Success Act (CLASS) which repealed and replaced the SDFQPA. L. 2015, ch. 4, secs. 4-22; K.S.A. 2015 Supp. 72-6463 *et seq*. CLASS operates as a "block grant" to school districts, essentially freezing K-12 funding levels for fiscal years 2016 and 2017 at the fiscal year 2015 level until the Act expires on June 30, 2017, by which time a replacement financing formula was to have been studied, designed, and put in place by the legislature. The panel later

6

declared CLASS unconstitutional for substantially the same reasons it earlier had declared the SDFQPA unconstitutional.

The State advances five basic issues arising out of the panel's actions on remand. Specifically, it complains (1) that the panel did not have jurisdiction to adjudicate the constitutionality of CLASS; (2) the state's compliance with Article 6 is a nonjusticiable political question; (3) the panel erred in not reopening the trial record and admitting additional evidence; (4) the panel's memorandum and order of December 2014 failed to adequately set out its findings of fact and conclusions of law pursuant to K.S.A. 2016 Supp. 60-252(a); and (5) the panel erred in holding that the state's K-12 public education financing system under CLASS is constitutionally inadequate.

After careful consideration of the arguments and the extensive record—including taking judicial notice of facts from accessible sources of indisputable accuracy at the invitation of the parties—we reject the State's contentions and affirm the panel's holding that the financing system is constitutionally inadequate.

We hold that CLASS does not meet the structure requirement contained in the *Gannon I* test. In effect, it is merely a fund created by freezing school districts' funding for 2 school years at a prior year's level. It also is only minimally responsive to financially important changing conditions such as increased enrollment.

We further hold that CLASS does not meet the implementation requirement of the *Gannon I* test for constitutional adequacy. Plaintiffs have shown through the evidence from trial—and through updated results on standardized testing since then—that not only is the State failing to provide approximately one-fourth of all its public school K-12 students with the basic skills of both reading and math, but that it is also leaving behind significant groups of harder-to-educate students. See, *e.g.*, *U.S.D. No. 229 v. State*, 256

Kan. 232, 244, 885 P.2d 1170 (1994) (some student populations to whom higher costs are associated). As of the 2015-2016 school year, some examples include:

- Approximately 15,000 of our state's African American students, or nearly one-half of their total student population, are not proficient in reading and math—subjects at the heart of an adequate education.

- Approximately 33,000 Hispanic students, or more than one-third of their student population, are not proficient in reading and math. When combined with the 15,000 underperforming African American students, the sum equates to approximately all the K-12 public school students in every school district in every county with an eastern boundary beginning west of Salina—more than one-half of the state's geographic area.

- More than one-third of our state's students who receive free and reduced lunches are not proficient in reading and math.

Plaintiffs have also proven by substantial competent evidence that the student performance reflected in this data is related to funding levels.

Accordingly, we conclude the state's public education financing system, through its structure and implementation, is not reasonably calculated to have all Kansas public education students meet or exceed the minimum constitutional standards of adequacy.

Given these conclusions, we next consider remedy. Our general practice with previous school finance decisions has been to retain jurisdiction and continue to stay the orders of the panel and our own mandate to provide the legislature an opportunity to bring the state's education financing system into compliance with Article 6 of the Kansas

8

Constitution. See *Gannon III*, 304 Kan. 490; *Gannon II*, 303 Kan. at 741-42; *Montoy v. State*, 278 Kan. 769, 775, 102 P.3d 1160 (2005) (*Montoy II*).

We continue that practice today because the legislature intended for CLASS only to be effective until June 30, 2017, and also because the State has twice demonstrated its ability to cure constitutional infirmities recognized by this court in the state's K-12 school finance system. See *Montoy v. State*, 282 Kan. 9, 24-25, 138 P.3d 755 (2006) (*Montoy IV*) (legislature's efforts in 2005 and 2006 constitute substantial compliance with prior orders; appeal dismissed); Sup. Ct. Order, Case No. 113,267 (June 28, 2016) (finding legislation cured equity constitutional infirmities in *Gannon* litigation).

Once a new financing system is enacted, the State will have to satisfactorily demonstrate to this court by June 30, 2017, that its proposed remedy is reasonably calculated to address the constitutional violations identified, as well as comports with previously identified constitutional mandates such as equity. See *Gannon II*, 303 Kan. at 743 ("[A]ny other funding system it enacts must be demonstrated to be capable of meeting the equity requirements of Article 6—while not running afoul of the adequacy requirement.").

For those purposes, the State will bear the burden of establishing such compliance and explaining its rationales for the choices made to achieve it. See *Gannon II*, 303 Kan. at 709 (party asserting compliance with court decision ordering remedial action bears burden of establishing that compliance).

Finally, we emphasize that the *Gannon I* test for adequacy is one reflecting minimal standards. *Gannon I*, 298 Kan. at 1170. Once they are satisfied, the requirements of Article 6 are satisfied and the court's role ends. See 298 Kan. at 1167. Whether the legislature chooses to exceed these minimal standards is up to that deliberative body and ultimately the people of Kansas who elect those legislators. See *Gannon I*, 298 Kan.

9

1158-1161 (recognizing that under Kansas Constitution many entities play roles in public education in Kansas and describing their roles and interplay); see also *U.S.D. No. 229*, 256 Kan. at 254 ("The issue for judicial determination is whether the Act satisfies [Article 6, sec. 6], not whether the level of finance is optimal or the best policy.").

## HISTORY AFTER REMAND

An extensive discussion of the history and factual background of this case, along with detailed explanations of the funding system for K-12 public education in Kansas, can be found in our three previous *Gannon* decisions. *Gannon I*, 298 Kan. at 1112-18; *Gannon II*, 303 Kan. at 686-98; *Gannon III*, 304 Kan. at 494-99. Here, we limit our discussion to a short overview relevant to the issues we are about to address.

*Panel's actions on remand*

After receiving this case on remand in March 2014, the panel requested certain information from the State, including updated student achievement statistics from the Kansas State Department of Education (KSDE). The panel also invited proffers regarding any evidence or information either party thought would be relevant to the panel's reconsideration of the issue of adequacy in light of *Gannon I*. The State complied with the request for the KSDE information but with objection. Specifically, the State expressed concern about the possibility of the panel ruling without the opportunity to introduce additional evidence on the adequacy issue such as updated data on the statewide district budgets.

The panel expressly declined to admit new evidence. It looked through the evidentiary proffers provided by the State "for facts or issues that would alter [its] original judgment . . . and found none would be of material, controlling significance." But

10

it did agree to take judicial notice of any new information if it found such information was not "reasonably subject to dispute."

The panel eventually issued three separate rulings regarding adequacy. The first two rulings—a 117-page order of December 30, 2014, and a shorter one of March 11, 2015—resolved that issue for the SDFQPA. The panel ultimately concluded through a declaratory judgment that this system, including the recent changes contained in 2014 Senate Substitute for House Bill No. 2506 (H.B. 2506), L. 2014, ch. 93, sec. 1 *et seq.*, was unconstitutionally inadequate under the *Rose*-based test we adopted in *Gannon I*. The panel held its structure was basically sound but its implementation, *e.g.*, actual funding of the formula, was not.

After these first two rulings were issued, in March 2015 the legislature passed, and the governor signed, House Substitute for Senate Bill No. 7, which instituted CLASS. Of relevance to this appeal, the legislation repealed the more than 20-year-old SDFQPA and its calculation of student weightings in the state aid funding formula. It was replaced with a 2-year block grant program expiring in June 2017 in which funding provided by the State for fiscal years 2016 and 2017 was essentially frozen at the SDFQPA-computed levels of fiscal year 2015—the 2014-2015 school year. *Gannon II*, 303 Kan. at 694.

The plaintiffs responded by challenging this new law on the same basic adequacy grounds as their attack on the SDFQPA. Among other things, they argued CLASS was merely an extension of the repealed, underfunded, and unconstitutional SDFQPA.

In the panel's third ruling regarding adequacy—an 84-page decision dated June 26, 2015—it held that CLASS "does nothing to alleviate the unconstitutional inadequacy of funding as expressed in our *Opinions* but, rather, exacerbates it." The panel was particularly concerned with changes CLASS made to the frequency of calculating specific student populations for purposes of determining special weightings that affect the

11

overall funding of particular districts. Because CLASS moved funding into a 2-year block grant, any subsequent increase or decrease in student populations—in general or by what the parties characterize as demographic "subgroups," *e.g.*, African American, Hispanic, English Language Learners (ELL), Disabled Students (also referred to as students with disabilities), and students receiving free and reduced lunches—would not lead to corresponding annual changes in funding. So the panel modified its December 30, 2014, declaratory judgment to order the State to implement the SDFQPA's former funding weightings in the current school year in which a distribution was to be made instead of the block grant funding of CLASS. See *Gannon II*, 303 Kan. 696.

Despite finding CLASS unconstitutional, the panel did not strike the block grant funding element. It believed its other remedial orders, including a temporary restraining order to prevent the State from implementing changes to the annual weighting calculations as structured under the SDFQPA, would "mitigate the urgency for giving any immediate effect to, or remedy in regard to, [its] ruling in regard to [CLASS.]" Four days later, on June 30, 2015, we stayed the panel's orders pending appeal to this court.

Thereafter, additional briefing on equity was conducted and adequacy's was scheduled for August 2016, with oral arguments to be heard in September. To date, approximately 850 pages of briefs—not counting their voluminous appendices—have been filed on the adequacy issue by the parties. The briefs contain numerous issues, arguments, and subpoints which we have consolidated by necessity.

We have jurisdiction under K.S.A. 2016 Supp. 60-2102(b)(1) (jurisdiction of supreme court may be invoked by appeal as a matter of right from a preliminary or final decision in which a statute has been held unconstitutional under Article 6 of the Kansas Constitution).

More facts will be added where necessary in each section of our analysis below.

## ANALYSIS

## JURISDICTION AND JUSTICIABILITY

Issue 1: *The panel had jurisdiction to adjudicate the constitutionality of CLASS.*

Plaintiffs asked the panel to enjoin CLASS's operation because it allegedly failed to remedy SDFQPA's inadequacies as identified in the panel's decision of December 2014 and as confirmed in its order of March 2015. Although CLASS was passed after our March 2014 remand in *Gannon I*, the panel determined it had jurisdiction to consider CLASS's constitutionality: "Clearly, the overall issue of adequacy, as remanded to us, is ready for review, including the issue of House Substitute for Senate Bill No. 7's . . . constitutional funding adequacy or inadequacy and its means for distribution of constitutionally needed funds." It eventually concluded CLASS violated both the equity and adequacy requirements of Article 6.

The State now challenges the panel's exercise of jurisdiction over CLASS without first requiring the plaintiffs to amend their pleadings and introduce evidence in support of their challenge to the new law. It alleges that by declaring CLASS violated the adequacy component of Article 6, the panel stepped outside of its jurisdiction and denied the State due process. The State argues that as a result, the panel acted improperly and its rulings on this issue therefore must be reversed.

13

*Standard of review*

"The existence of jurisdiction is a question of law over which this court's scope of review is unlimited." *Schmidtlien Elec., Inc. v. Greathouse*, 278 Kan. 810, 830, 104 P.3d 378 (2005).

*Discussion*

We rejected a similar jurisdictional argument by the State 1 year ago in *Gannon II*. There, the State contended the panel had exceeded the scope of our March 2014 mandate on remand when it held CLASS was *inequitable* and thus unconstitutional. The State argued the panel was without authority to consider CLASS's constitutionality because, among other things, CLASS's funding element was different than the SDFQPA's—which the panel had held unconstitutional. 303 Kan. at 705.

We rejected this argument with an analysis applicable to the State's present contention:

"We . . . disagree with the State that the panel lacked authority to consider these aid provisions under CLASS because they represent 'a substantial shift in Kansas' financing of K12 public education.' The State quotes at length from our opinion in *Montoy* [*IV*] . . . where we refused to review the constitutionality of remedial legislation that had 'so fundamentally altered the school funding formula that the school finance formula that was at issue in this case no longer exists.'

"We cannot make a similar 'substantial shift' observation about CLASS." *Gannon II*, 303 Kan. at 706 (quoting *Montoy IV*, 282 Kan. at 25).

Indeed, we determined "[i]n sum, the legislature essentially created CLASS as a mere extension of the fiscal year 2015 funding system [SDFQPA]. It is not a substantial

14

shift in the way funds are distributed for public education." *Gannon II*, 303 Kan. at 706. As additional support, we observed we were "not the only appellate court to reach this conclusion." 303 Kan. at 706. We quoted the 10th Circuit Court of Appeals in a federal lawsuit involving CLASS:

> "'Despite the changes to Kansas' system of school financing, the core elements challenged by plaintiffs remain. Although the SDFQPA formula has been replaced by block grants for the next two years, those grants are calculated primarily using the now-repealed SDFQPA formula.'" 303 Kan. at 706-07 (quoting *Petrella v. Brownback*, 787 F.3d 1242, 1256 [10th Cir. 2015]).

Speaking practically, there is no need to require the plaintiffs to formally amend their pleadings and introduce evidence in support of their challenge to the new law— when it is basically an extension of the prior law for which substantial evidence had been received and the State's similar jurisdictional argument had already been analyzed and rejected by this court.

Even if we do not embrace practicality to reject the State's argument, we additionally note that other Kansas school finance decisions demonstrate a court's continuing jurisdiction over legislation passed subsequent to, or as a remedy for, an order declaring the preceding law unconstitutional. In *Montoy II*, this court had declared a prior version of the SDFQPA unconstitutional and retained jurisdiction to allow the legislature an opportunity to respond with remedial legislation. *Montoy v. State*, 279 Kan. 817, 819, 112 P.3d 923 (2005) (*Montoy III*) (describing *Montoy II*). Lawmakers responded by amending the act, which was returned to this court for review. The State then argued that the new law was not properly before this court because the prior decisions addressed legislation which no longer existed. We disagreed with this reasoning. 279 Kan. at 825.

Here, on December 30, 2014, the panel issued a declaratory judgment holding the funding under the SDFQPA unconstitutionally inadequate. The State's own brief argues

CLASS was passed in response to this ruling less than 3 months later. As a result, the panel appropriately considered whether CLASS substantially changed K-12 funding to render the case and its order moot—or, if not, whether CLASS remedied the inadequacies the panel previously identified. Both the December 2014 and June 2015 judgments at their heart declared legislative funding inadequate, which resulted in unconstitutionality, as confirmed by the June 2015 ruling:  "SB 7, by its failure to provide *funding* consistent with the needs found in our *Opinion* of December 30, 2014, and by *freezing the inadequacy* we found existing through FY 2015 for FY 2016 and FY 2017, also stands, unquestionably, and unequivocally, as constitutionally *inadequate in its funding*." (Emphasis added.)

Based on the authorities cited above, we conclude the panel had jurisdiction to consider whether CLASS was constitutional, *e.g*., conformed to its previous decisions.

Issue 2:  *The legislature's compliance with Article 6 is a justiciable issue.*

In *Gannon I*, we held that whether the legislature has made suitable provision for the finance of the State's educational interests under Article 6 was not a political question and was therefore justiciable. En route to that conclusion, we expressly rejected the State's specific argument under *Baker v. Carr*, 369 U.S. 186, 82 S. Ct. 691, 7 L. Ed. 2d 663 (1962), that the language of Article 6 lacked judicially discoverable and manageable standards for resolving the substantive issues. *Gannon v. State*, 298 Kan. 1107, 1161, 319 P.3d 1196 (2014) (*Gannon I*). Later in *Gannon I* we adopted the capacities first articulated by the Kentucky Supreme Court in *Rose v. Council for Better Educ., Inc.*, 790 S.W.2d 186, 212 (Ky. 1989), as the minimal educational adequacy requirements of Article 6. 298 Kan. at 1170.

In each of its three briefs in the present adequacy appeal, the State renews its *Gannon I* contention that its duty under Article 6 is beyond the capacity or role of the

16

courts to enforce. And it now adds the particular contention that the *Rose* standards themselves are "not judicially manageable" and are "extremely nebulous and vague." In other words, they demonstrate the existence of a nonjusticiable political question.

*Standard of review*

"[W]hether a claim is nonjusticiable specifically because it may be a political question is an issue of law." *Gannon I*, 298 Kan. at 1136-37.

*Discussion*

In *Gannon I* we performed an extensive analysis to address the State's argument that the legislature's compliance with its Article 6 duty was not justiciable because it was a political question. 298 Kan. at 1134-61. We thoroughly considered the State's contentions under four of the six justiciability factors identified in *Baker v. Carr*, 369 U.S. 186, especially whether judicially discoverable and manageable standards exist for resolving the substantive issue, *e.g.*, equity. 298 Kan. at 1139-61. Foreshadowing its present contention, the State pointedly argued that "'suitable provision for finance' is amorphous, and 'suitable' is 'extremely vague.'" 298 Kan. at 1149. We rejected this argument. 298 Kan. at 1149-56.

We cited, and agreed with, the majority of supreme courts which held their state constitution's education article presented justiciable issues. We observed

> "that courts are frequently called upon, and adept at, defining and applying various, perhaps imprecise, constitutional standards. The Texas Supreme Court in *Neeley* [*v. West Orange-Cove*, 176 S.W.3d 746 (Tex. 2005)] observed that disagreements about the meaning of the state constitutional language 'are not unique to the [state's education clause]; they persist as to the meanings and application of due course of law, equal protection, and many other constitutional provisions.'" 298 Kan. at 1155.

17

We further noted that judicial determinations are often required for whether a punishment is "'cruel and unusual'" and for defining and discerning the difference between "'probable cause'" and "'reasonable suspicion.'" 298 Kan. at 1155.

We also pointed to our state's own history in school finance litigation. We declared that our court would not previously have established procedures for the trial court and counsel to follow when handling any "'suitable provision'" for finance claims if indeed "there were no manageable standards for the courts to apply." 298 Kan. at 1150.

Despite our rejecting the State's argument 3 years ago in this litigation that the legislature's duty created by the language of Article 6 did not lend itself to judicial management and enforcement and thus was nonjusticiable, it now argues that the seven, more detailed standards of *Rose* are "extremely nebulous and vague" and thus cannot be judicially manageable. The State's primary support is *Londonderry Sch. Dist. v. State*, 154 N.H. 153, 907 A.2d 988 (2006).

At the outset, we observe the law of the case doctrine readily can serve as a basis for us to refuse to review the core of this particular issue a second time. As the State itself points out elsewhere in its brief in support of one of its arguments:  This "doctrine 'promotes the finality and the efficiency of the judicial process'—two virtues that are particularly important in this ongoing litigation—by eliminating 'indefinite relitigation of the same issue.' *State v. Collier*, 263 Kan. 629, Syl. ¶ 2, 952 P.2d 1326 (1998)."

Even if we do not apply the law of the case doctrine to refuse review of the State's current twist on the political question issue that we resolved in *Gannon I*, we additionally note, "The *Rose* court constitutional standards have been remarkably paralleled since 2005 by the Kansas Legislature's express educational goals . . . ." *Gannon I*, 298 Kan. at 1166; see K.S.A. 2013 Supp. 72-1127(c). And shortly after this court issued its decision

18

in *Gannon I*, the Kansas Legislature amended 72-1127 effective May 1, 2014, so that its express education goals were made identical to the seven goals set out by the *Rose* court. Of even greater application to the State's argument, we observe the legislature has expressly required the State Board of Education (SBE) to develop curriculum to meet those seven goals. The statute provides: "Subjects and areas of instruction shall be designed by the state board of education to achieve the goal established by the legislature of providing each and every child with at least the following capacities [the *Rose* standards]." K.S.A. 2016 Supp. 72-1127(c). And these SBE-designed subjects and areas of instruction are required to be taught in every accredited school in the state. K.S.A. 2016 Supp. 72-1127(a).

With this language in effect for the last 12 years, the legislature itself necessarily acknowledges that the SBE—which the legislature has entrusted with developing curriculum for Kansas public school students—is capable of understanding, measuring, and implementing the *Rose* educational goals in order to meet its important statutory duty. This legislative acknowledgment greatly undermines the State's argument that the standards are not judicially discoverable or manageable because they are extremely nebulous and vague. *Cf. City of Wichita v. Sealpak Co.*, 279 Kan. 799, 806, 112 P.3d 125 (2005) (Admissions against interest made by a party are the strongest kind of evidence and override other factors.). Further undermining the State's allegation of vague and nebulous *Rose* standards is CLASS's more recent language designating these standards, as codified in K.S.A. 2016 Supp. 72-1127, as one of the legislature's "guiding principles for the development of subsequent legislation for the finance of elementary and secondary public education." See L. 2015, ch. 4, sec. 4(c)(4).

Despite the State's apparent conflicting positions—and the law of the case doctrine—we also will briefly address *Londonderry.* The State points out that the New Hampshire Supreme Court determined the state legislature failed to properly define an adequate education but continued to grant deference and refused to substitute its own

19

definition of "adequate" in lieu of the legislature's. But *Londonderry* cannot stand for the proposition that the *Rose* standards themselves are judicially unmanageable because the New Hampshire Supreme Court previously had adopted them as its state's minimum educational requirements in the *Claremont* decisions. See *Claremont School Dist. v. Governor*, 142 N.H. 462, 703 A.2d 1353 (1997) (*Claremont II*); see also *Claremont School Dist. v. Governor*, 138 N.H. 183, 635 A.2d 1375 (1993) (*Claremont I*); *Claremont School Dist. v. Governor*, 144 N.H. 210, 744 A.2d 1107 (1999) (*Claremont III*); and *Claremont School Dist. v. Governor*, 147 N.H. 499, 794 A.2d 744 (2002) (*Claremont IV*).

Instead, the *Londonderry* court's main complaint was the legislature's failure to take any steps in enunciating a system that would *meet* the criteria set out in *Rose*. 154 N.H. at 161. By failing to do so, the court warned, "the legislature create[d] the potential for a situation in which a superior court judge, or a special master appointed by th[e] court, [would] be required to decide what is to be taught in the public schools in order to provide the opportunity to acquire [the *Rose* standards]." *Londonderry*, 154 N.H. at 160.

In other words, if—as the State alleges—the *Rose* standards themselves were indeed "judicially unmanageable," the *Londonderry* court certainly would not have warned the legislature that a *judge* would manage them, *i.e.*, decide what is to be taught in order to provide the opportunity to acquire the skills and knowledge they describe. Nor would the court have concluded its decision as follows:  "[T]he judiciary has a responsibility to ensure that constitutional rights not be hollowed out and, in the absence of action by other branches, a judicial remedy is not only appropriate but essential. *Petition of Below*, 151 N.H. 135, 855 A.2d 459 (2004). We urge the legislature to act." 154 N.H. at 163. Instead, the *Londonderry* court simply would have declared the question to be political and nonjusticiable and dismissed the case. See *Gannon I*, 298 Kan. at 1137 (acknowledging dismissal of case as nonjusticiable is appropriate when at least one of the *Baker* elements or factors "'is inextricable from the case at bar'").

20

In summary, we continue to hold that the legislature's compliance with its Article 6 duty is a justiciable issue. The State has failed to show why the law of the case doctrine does not bar our review of justiciability. And even if the doctrine did not serve as a bar, the State has failed to show that Article 6's requirements are rendered less judicially manageable because we have adopted the seven *Rose* standards as that article's minimum requirements—much as the legislature has adopted those same standards as a guiding principle for its efforts in developing public school finance mechanisms to replace CLASS after it expires.

## PROCEDURAL ISSUES

Issue 3: *The panel did not abuse its discretion in refusing to reopen the record on remand.*

After our March 2014 remand to the panel per our *Gannon I* decision, the plaintiffs requested the panel rule on the adequacy issue based on the existing trial record of 21,000 pages. The State opposed this procedure and argued the panel should allow new evidence.

The panel invited evidentiary proffers from both sides and heard arguments on whether to reopen the record. The panel eventually concluded it would limit its review to the existing trial record, with the exception of taking judicial notice of certain updated data on statewide district budgets and student performance statistics.

The State objected and continued to request that the panel allow new evidence on adequacy and proffered certain documents it wanted the panel to consider. In general, the State provided statistical information regarding past and current funding—including the levels of federal monies, local option budget (LOB) funds, and contributions to Kansas Public Employees Retirement System (KPERS). The State also provided information on

districts' compliance with accreditation standards, as well as how certain state programs addressed the *Rose* standards specifically.

The State additionally attached state-wide and district specific statistics on proficiency levels in various subjects. This included a breakdown of student demographic categories the parties refer to as subgroups—as well as their relative achievement measurements. The State also asked the panel to consider data for comparing national student success rates with Kansas students' achievement through standardized measurements, *e.g.*, the ACT, SAT, and National Assessment of Educational Progress (NAEP).

The panel declared in its December 2014 decision that all the State's new submissions were "diligently searched . . . for facts or issues that would alter our original [January 2013] judgment," but concluded none were of significance. Nevertheless, the State argues the panel erred in ruling on the funding system's adequacy without admitting the current data into evidence. Because the plaintiffs sought injunctive relief, the State argues the panel was required to look to the current and future state of affairs instead of relying on the prior record. See, *e.g.*, *Frizell v. Bindley*, 144 Kan. 84, 94, 58 P.2d 95 (1936) (wrongs already committed cannot be corrected or prevented by injunction). According to the State, because the panel relied primarily on old information, the panel erred when it later declared CLASS unconstitutional.

The State also argues that the panel should not have taken judicial notice of facts or information without allowing the parties to contest them. In particular, it argues KSDE's statistics on Kansas students' proficiency scores for 2012-2013—the most recent data then available—was inappropriate for judicial notice and consideration because the validity of that school year's standardized testing results was in dispute.

*Standard of review*

Whether a trial court erred in refusing to permit a party to reopen a case to introduce additional evidence is reviewed for abuse of discretion. See generally *Westamerica Securities, Inc. v. Cornelius*, 214 Kan. 301, 306, 520 P.2d 1262 (1974) (citing cases). Our abuse of discretion standard is well-established:

> "Judicial discretion is abused if judicial action is (1) arbitrary, fanciful, or unreasonable, *i.e.*, if no reasonable person would take the view adopted by the trial court; (2) based on an error of law, *i.e.*, if the discretion is guided by an erroneous legal conclusion; or (3) based on an error of fact, *i.e.*, substantial competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based." *State v. Davisson*, 303 Kan. 1062, 1065, 370 P.3d 423 (2016) (citing *State v. Beaman*, 295 Kan. 853, 865, 286 P.3d 876 [2012]).

The party asserting an abuse of discretion bears the burden of establishing such abuse. *State v. Corbin*, 305 Kan. 619, 622, 386 P.3d 513 (2016). The State does not specify which of the three categories of judicial discretion abuse it alleges. But it appears to argue that no reasonable person would have agreed with the panel.

*Discussion*

The State correctly asserts that injunctive relief must address future action or remedy an ongoing wrong—not "wrongs already committed." See *Andeel v. Woods*, 174 Kan. 556, 559, 258 P.2d 285 (1953). But it incorrectly asserts that the panel ignored this well-known judicial tenet. The panel stated it considered both the existing record as well as later legislation in determining that the inadequacies in the state's K-12 financing system remained. While it mainly reviewed the existing record, it did take judicial notice of public information regarding recent funding levels as well as student performance data. Its original December 2014 declaratory judgment and temporary restraining order in

23

June 2015 were clearly aimed at remedying what it found to be present and ongoing inadequacies in the SDFQPA and then in CLASS.

Accordingly, the determinative question is whether the panel abused its discretion by refusing the State's request to reopen the record on remand. See *Westamerica Securities*, 214 Kan. at 306.

Here, the panel invited proffers of any evidence either party deemed relevant or appropriate for consideration along with requesting updates on the state's K-12 funding levels and other data. The State accepted this invitation and proffered the evidence it wished to introduce into the record. The panel was clear in its rulings that it reviewed and considered the State's proffers, but found them to be unpersuasive. The panel's decision dated December 30, 2014, stated:

> "*We diligently searched the State's proffers for facts or issues that would alter our original judgment* [January 2013] *or change the course of the one we now issue* [December 2014] *and found none would be of material, controlling significance.* No testimony was proffered nor can we perceive of any but a pure recantation of prior testimony that would cause us to consider any had it been offered." (Emphasis added.)

And in its order dated March 11, 2015, the panel reiterated it had thoroughly reviewed the State's proffers—but also noted the State appeared to additionally rely upon some nonproffered evidence:

> "The State made its proffers over objection, *but yet now apparently claims some reservoir of undisclosed evidence, yet still not proffered, that needs to be considered.* We reject this latter overture as inconsistent with our directive and find even the facts *now* listed in its motion to alter or amend present nothing unknown or the objective or premise upon which they rest *not previously thoroughly considered. We reviewed fully all the State's submissions and found none would aid, alter, or change our prior opinions.*" (Emphasis added.)

24

To the extent the panel also considered the proffers unpersuasive because they merely contained information that was cumulative to what was already in evidence, we observe an exclusion on this basis would also be reviewed for an abuse of discretion. *State v. Reed*, 282 Kan. 272, 280, 144 P.3d 677 (2006) (citing *State v. Lee*, 266 Kan. 804, 813, 977 P.2d 263 ([1999]).

The data and assertions in the State's proposed findings of fact and conclusions of law to the panel after remand at most simply supported the State's original proposed findings of fact and conclusions of law with more recent data. But the purpose of this information—supporting the State's defense—had not changed from the time of trial.

Most important, the panel was able to determine how, if at all, the updated information would influence its decision on adequacy because it reviewed the State's proffers. After the State proffered its evidence, the plaintiffs filed a pleading stating they had "no objection or response to the information presented." Nor did they contest the accuracy of the State's submissions. The panel, as it stated in its orders, then "reviewed fully" the submissions and found no facts—or premise upon which they rested—it had "not previously thoroughly considered." So we cannot say no reasonable person would have agreed with the panel's decision refusing to reopen the record. *Davisson*, 303 Kan. at 1065.

As for the State's additional complaint that the panel improperly took judicial notice of information that was subject to dispute without allowing the parties to introduce similar evidence in support or opposition, it specifically complains about the panel's consideration of the proficiency data or "report card" compiled by the KSDE for school year 2012-2013. The State argues that because KSDE considered the results of these standardized tests an "anomaly," this information was in dispute and thus improperly considered by the panel. It points out that the panel eventually incorporated these

25

anomalous decreases in student performance to support its December 30, 2014, decision which held that student subgroup performance helped show the inadequacy of Kansas' K-12 education funding system. Accordingly, the State again appears to allege an abuse of the panel's discretion in the admission of these results into evidence. See *Catholic Housing Services, Inc. v. State Dept. of SRS*, 256 Kan. 470, 478, 886 P.2d 835 (1994) (judicial notice is a rule of evidence).

But this particular evidence was not in "dispute" as defined by Kansas law. The applicable statute, K.S.A. 60-409(b), states in relevant part: "Judicial notice may be taken without request by a party, of . . . (4) specific facts and propositions of generalized knowledge which are capable of immediate and accurate determination *by resort to easily accessible sources of indisputable accuracy*." (Emphasis added.) The State does not dispute, however, that the test results themselves were accurately recorded or readily available to the panel through the KSDE. Rather, the State simply complains that the panel should not have considered them because the scores themselves did not accurately reflect student achievement.

In its proposed findings of fact and conclusions of law, the State provided the panel with KSDE's cautionary statement explaining the tests administered were not aligned with instruction of a new statewide curriculum:

> "As Kansas continues its transition to higher education standards . . . many schools experienced a decline in the results of their students' latest state assessment scores. While this is never a desired outcome, in a time of transition it is certainly not altogether unexpected. . . . Because the new standards assessment was not available for the 2012-13 assessment period, students were assessed using the existing testing tool which is no longer aligned with the new instruction. *As such, we caution the use of recent assessment scores as a true indication of the student's progress*." (Emphasis added.)

26

The panel readily acknowledged the State's objection to its use of the 2012-2013 test results. After its review of this data which showed "drops in all categories," the panel also considered the basis of the objection, *i.e.*, the proffered cautionary KSDE statements:

"*We recognize, as proffered by the State, these 2012-2013 statistics were possibly affected by the change in nomenclature and the approach to the proficiency measures*. . . . Nevertheless, the tests noted were still given, and *minimally*, these statistics provide *no evidence of student progress* and *no* evidence has been proffered to us otherwise." (Emphasis added.)

Moreover, the panel's procedure comports with K.S.A. 60-412 which governs judicial notice in proceedings subsequent to trial. That statute provides: "A judge . . . taking judicial notice [under this act] of matter not theretofore so noticed in the action shall afford the parties reasonable opportunity to present information relevant to the propriety of taking such judicial notice and to the tenor of the matter to be noticed." K.S.A. 60-412(d). The panel afforded the parties, and the State accepted, the opportunity to provide "any further evidence or considerations thought appropriate" after the panel's request regarding the KSDE information. The State provided proffers outlining its concerns about the 2012-2013 test results—which the panel duly considered.

At their core, the State's complaints essentially go to the weight of this KSDE evidence rather than its admissibility through judicial notice. The State does not contest the authenticity of the results of the standardized tests themselves—with good reason, because the fact that these scores were recorded and later published by KSDE is not subject to reasonable dispute under K.S.A. 60-409(b)(4). See *Harris v. Shanahan*, 192 Kan. 183, 207, 387 P.2d 771 (1963) (supreme court took judicial notice of population statistics contained in official publications of Kansas State Department of Agriculture and Secretary of State and "any other public official or bureaus of the state"); see also *Popp v. Motor Vehicle Department*, 211 Kan. 763, 768, 508 P.2d 991 (1973) (court may take judicial notice of statistics compiled by the safety department of the highway commission

27

of the State of Kansas revealing the number of accidents caused by drunk driving in particular year). KSDE is obviously such a state department. See K.S.A. 72-7701 (creating State Department of Education and placing it under administrative control of the commissioner of education as directed by law and by State Board of Education).

Indeed, in the lengthy appendices to its briefs and at oral arguments, the State agreed that this court could judicially notice the current reports and publications of the KSDE that were publicly available, particularly those concerning school year 2014-2015 that purported to support its own argument. See K.S.A. 60-412(c) ("The reviewing court in its discretion may take judicial notice of any matter specified in K.S.A. 60-409 whether or not judicially noticed by the judge."); *Harris*, 192 Kan. at 207 (appellate judicial notice of facts not noticed by trial court).

In conclusion, this court's remand order entirely left for the panel to decide whether the record should be reopened to accept additional evidence. See *Gannon v. State*, 298 Kan. 1107, 1171, 319 P.3d 1196 (2014) (*Gannon I*) ("We express no opinion whether the panel needs to reopen the record to make its adequacy determination. That decision is best left to the panel as the factfinder."). Its refusal to do so is reviewed for abuse of discretion. And we hold under the circumstances presented that the panel's refusal to open the record and formally admit additional evidence proffered by the State—all of which the panel thoroughly reviewed and found unpersuasive—was not such an abuse. See *Westamerica Securities*, 214 Kan. at 306. Nor was it error for the panel to take judicial notice of KSDE's published student test results for 2012-2013. See *Harris*, 192 Kan. at 207.

28

Issue 4:  *The panel's memorandum and order satisfied the requirements of K.S.A. 2016 Supp. 60-252(a).*

The State argues that our *Gannon I* decision ordering remand, as well as K.S.A. 2016 Supp. 60-252(a), required the panel to separately set out findings of fact in its December 2014 ruling—which the panel failed to do.

In the panel's pre-*Gannon I* decision dated January 11, 2013, it expressly adopted all the plaintiffs' proposed findings of fact and conclusions of law, subject to certain amendments and omissions, and clearly included them in its 250-page decision. The panel distinguished these findings from the rest of its decision by their enumeration and typesetting. The numerous findings and conclusions cited to a wide range of submitted evidence with citations to the record that included such things as prior testimony, evaluations and conclusions of cost studies, prior funding levels of K-12 education, expert testimony, and current district budget amounts.

The panel's decisions after remand by *Gannon I* differed slightly. In its December 2014 decision, the panel expressly declined to adopt either party's latest proposed findings of fact or conclusions of law. But it expressly adopted its own January 11, 2013, findings of fact and conclusions of law with certain amendments. Instead of following that decision's format by distinctly making additional specific findings, however, the panel simply cited to various points of evidence throughout its 2014 decision in support of its findings and conclusions.

Its March 2015 Order further specified the parameters of its findings:

"[T]he record upon which our *Order on Remand* [December 2014] was premised was confined to the original record on appeal and based on those facts and exhibits identified in our January 11, 2013 *Opinion* and *such additional facts or matters subject of judicial*

29

*notice as are explicitly identified* in our December, 30, 2014 *Memorandum Opinion and Order on Remand*." (Emphasis added.)

The panel made clear that it readopted the findings of fact from its January 2013 opinion and incorporated "what [it] found without restatement[.]" In addition to those previous panel findings, it essentially rejected all facts inconsistent with its January 2013 and December 2014 opinions, as it further explained in its March 2015 order:

> "Throughout both *Opinions* [January 2013 and December 2014] *we identified the certain facts or exhibits we deemed controlling and that would exemplify our acceptance or rejection of the premise or an issue raised and discussed the efficacy of any conflict or premise toward which they were asserted.* We feel no need to go further than this either in the identification of supporting facts and exhibits or their discussion." (Emphasis added.)

The panel's March 2015 order elaborated on this theme:

> "This case was simply not a case where it would be at all helpful to list the plethora of separately proffered facts and exhibits one by one followed by either a plus or minus representing whether it was true or false or relevant or not relevant. *We harbor no doubt that the parties know why they did or did not prevail on the issues raised.*" (Emphasis added.)

The panel assured the parties that "this court looked at all the facts and either identified or discussed, or identified and discussed, only those necessary to the premise and finding accepted or rejected by us, pushing all cumulative or not controlling facts aside."

*Standard of review*

The State's objections require this court to determine a trial court's duties under K.S.A. 2016 Supp. 60-252 when rendering a judgment. "Interpretation of a statute is a question of law, and an appellate court's review is unlimited." *Zimmerman v. Board of Wabaunsee County Comm'rs*, 289 Kan. 926, Syl. ¶ 1, 218 P.3d 400 (2009).

*Discussion*

The statute upon which the State relies, K.S.A. 2016 Supp. 60-252(a), states:

> "*Findings and conclusions.* (1) *In general.* In an action tried on the facts without a jury or with an advisory jury or upon entering summary judgment, the court must find the facts specially and state its conclusions of law separately. The findings and conclusions may be stated on the record after the close of evidence, or may appear in an opinion or a memorandum of decision filed by the court. Judgment must be entered under K.S.A. 60-258, and amendments thereto."

In explaining the statutory purpose, this court has stated that "'the rules requiring expression of controlling findings of fact [citation omitted] and controlling principles of law [citation omitted] are designed as an aid to the integrity of the decision.'" *Mies v. Mies*, 217 Kan. 269, 274, 535 P.2d 432 (1975). Additionally, "[t]he requirements of K.S.A. 60-252(a) . . . are for the benefit of this court in facilitating appellate review." *Henrickson v. Drotts*, 219 Kan. 435, 441, 548 P.2d 465 (1976). Accordingly, "'[w]here the findings and conclusions of the trial court are inadequate to permit meaningful appellate review, [there is] no alternative but to remand the case for new [or additional] findings and conclusions.'" *Baker University v. K.S.C. of Pittsburg*, 222 Kan. 245, 254, 564 P.2d 472 (1977).

Consistent with these purposes, this court has said:

> "The findings required by K.S.A. 60-252(a) should be sufficient to resolve the issues, and in addition they should be adequate to advise the parties, as well as the appellate court, of the reasons for the decision and the standards applied by the court which governed its determination and persuaded it to arrive at the decision." *Andrews v. Board of County Commissioners*, 207 Kan. 548, 555, 485 P.2d 1260 (1971).

Stated another way, "the court's findings and conclusions should reflect the factual determining and reasoning processes through which the decision has actually been reached." *Duffin v. Patrick*, 212 Kan. 772, 774, 512 P.2d 442 (1973) (citing 9 Wright and Miller, Federal Practice and Procedure § 2578).

The panel's first decision on remand of December 30, 2014, is 117 pages long—excluding its attached appendix. In it, the panel reviews this court's remand order and the procedural history of the case before discussing the facts and its resultant conclusions. It outlines its legal conclusions based on the precedent of Kansas school finance cases, as well as on the basis of facts from the record which it cites throughout.

Additionally, the panel expressly readopted specific and enumerated factual findings contained in its January 2013 decision—"[pages] 55-190 by fully incorporating what we found without restatement here." Kansas appellate courts have held such adoptions and incorporations by reference comply with the requirements of K.S.A. 2016 Supp. 60-252(a). In *Executive Financial Services, Inc. v. Loyd*, 238 Kan. 663, 715 P.2d 376 (1986), the appellants alleged the trial court improperly dismissed their counterclaim without setting forth specific findings of fact and conclusions of law. In its journal entry, the trial court had adopted by reference the findings of fact and conclusions of law it detailed in previous memoranda. This court concluded: "We can find no error in the trial court's failure to repeat the findings of fact and conclusions of law in its decision . . . ." 238 Kan. at 668. See also *In re Adoption of Chance*, 4 Kan. App. 2d 576, 581, 609 P.2d

232 (1980) (rejecting K.S.A. 60-252[a] [Weeks] challenge to findings and conclusions: although probate judge "did not specifically adopt the findings of the court in the habeas corpus proceedings as his own, it is apparent he considered that record and entered his judgment, at least in part, on the basis of that evidence"). *Cf. Taylor v. Kobach*, 300 Kan. 731, 737, 334 P.3d 306 (2014) (Incorporation by reference is "'[a] method of making a secondary document part of a primary document by including in the primary document a statement that the secondary document should be treated as if it were contained within the primary one.'") (quoting Black's Law Dictionary 834 (9th ed. 2009).

We conclude the State's concerns are without merit. Particularly given the nature of the evidence and the expansive record—as of the January 2013 decision, 21,000 pages after a 16-day bench trial, with subsequent judicial notice of more facts and consideration of the State's proffers—we find no fault with the panel deciding not to specifically address all submitted evidence and further lengthen its 117-page decision of December 2014.

Simply put, the State has failed to show that the panel's decision of December 2014 prevents our ability to meaningfully review the panel's findings and conclusions: They sufficiently reflect the factual determining and reasoning processes through which the decision had actually been reached. See *Duffin*, 212 Kan. at 774.

ADEQUACY (ON THE MERITS)

To understand this section's analysis of adequacy under Article 6, Section 6 of the Kansas Constitution, a more complete historical overview than that provided in the History After Remand is important. In *Gannon I*, 298 Kan. at 1112-15, we set forth the SDFQPA and events leading to the filing of the present suit in 2010. Here they are summarized and supplemented.

33

Since 1992, the SDFQPA had established the formula and mechanism through which most funds for K-12 public education were obtained by Kansas school districts. See *U.S.D. No.* 229 *v. State*, 256 Kan. 232, 885 P.2d 170 (1994). The formula provided a fixed amount of funding for each student through "base state aid per pupil," also known as BSAPP. A district's full-time equivalent enrollment was adjusted by adding various weightings based on the recognition that the needs of some students require more resources for their education than others. These included such things as low enrollment, special education, vocational, bilingual education, and at-risk student weighting factors. Once a school district's enrollment was adjusted per the weightings, that figure was multiplied by the BSAPP. The resulting product was the amount of state financial aid to which the school district was entitled.

Funding for the BSAPP was derived from two sources:  local effort and state financial aid. The majority of school districts' local effort consisted of property tax funds, as each district was statutorily required to impose a mill levy—currently 20 mills per K.S.A. 2016 Supp. 72-6470—upon taxable tangible property in its territory. Because property values vary widely throughout the state, the amount of money each district could raise by the required mill levy also varied widely. So the State provided additional funds to less wealthy districts through "general state aid."

If a district's local effort funds equaled its state financial aid entitlements, it received no additional money from the State, *i.e.*, general state aid. And if a district's local effort funds exceeded its state financial aid entitlement, the excess was remitted to the State. For those districts qualifying for general state aid, their amount was what remained after subtracting their local effort funds from their state financial aid entitlement.

Local effort and state financial aid—as calculated using BSAPP and enrollments—comprised most of the funds available for K-12 education. But school districts could access additional funds in several ways, two of which were previously at issue in this case in our equity holdings.

First, a local school board could impose an additional mill levy on property in its district to fund a local option budget (LOB) to augment the funds that were distributed through the BSAPP. After application of a statutory formula, in order to account for differences in property wealth among the districts, the less wealthy ones could also qualify for, and receive from the State, "supplemental general state aid."

Second, a local board could also impose an additional mill levy on property in its district to fund capital outlay expenses such as purchasing certain equipment. After application of a statutory formula, the less wealthy districts could also qualify for, and receive from the State, "school district capital outlay state aid."

Montoy

The structure of the SDFQPA as originally challenged by the *Gannon* plaintiffs had been modified in response to our holdings arising from litigation in *Montoy v. State*. These are:  *Montoy v. State*, 275 Kan. 145, 62 P.3d 228 (2003) (*Montoy I*); *Montoy v. State*, 278 Kan. 769, 102 P.3d 1160 (2005) (*Montoy II*); *Montoy v. State*, 279 Kan. 817, 112 P.3d 923 (2005) (*Montoy III*); and *Montoy v. State*, 282 Kan. 9, 138 P.3d 755 (2006) (*Montoy IV*).

This litigation acknowledged that the BSAPP when the SDFQPA was first implemented in 1992 was $3,600. *Montoy III*, 279 Kan. at 830. The State gradually increased BSAPP through small yearly increments until it reached $3,890 in 2002. At that time, the legislature had the results of its commissioned study from Augenblick and

Meyers (A & M) for its consideration, which proposed the state implement a BSAPP of $4,650 for 2001. 279 Kan. at 830. After our decision in *Montoy II*, the legislature responded by increasing BSAPP from $3,890 to $4,222 through a $63.3 million increase in state funding. 279 Kan. at 830.

We found this response to be inadequate. 279 Kan. at 845-46. During a special session called later that same month, the legislature timely amended the formula and provided a funding increase totaling $289 million for the 2005-06 school year. *Gannon I*, 298 Kan. at 1114. This amount represented one-third of the amount proposed by the A & M study which had been previously disregarded by the State. But, as we explained in *Gannon I*, this did not imply that full funding of this study's recommended amount was required for constitutional compliance. 298 Kan. at 1170.

While *Montoy* was pending, the legislature directed the Legislative Division of Post Audit (LPA), to "conduct a professional cost study analysis to estimate the costs of providing programs and services required by law." K.S.A. 2005 Supp. 46-1131(a). This included "(1) State statute; and (2) rules and regulations or standards relating to student performance outcomes adopted by the state board" of education. 46-1131(b). These statutes included K.S.A. 2005 Supp. 72-1127, which required the SBE to design performance outcome standards to achieve the educational goals newly established by the 2005 legislature in subsection (c)—goals that were "remarkably parallel" to the *Rose* standards. *Gannon I*, 298 Kan. at 1166-67.

In response to our *Montoy III* decision as well as the results of the LPA study, in 2006 the State increased education funding by $466.2 million stretching over the upcoming 3 years which, when combined with the previous increases, totaled $755.6 million. *Gannon I*, 298 Kan. at 1114. This funding increase included raising the BSAPP for fiscal year 2007 from $4,257 to $4,316; to $4,374 for fiscal year 2008; and up to $4,433 for fiscal year 2009. 298 Kan. at 1114.

36

Given these statutory provisions, we held that the new funding system in place by that time constituted substantial compliance with our prior orders, so we dismissed the *Montoy* litigation. In relinquishing jurisdiction, we recognized that because the State's new funding provisions constituted a 3-year plan it "may take some time before the full financial impact of the new legislation [was] known, a factor which would be important in any consideration of whether it provide[d] constitutionally suitable funding." *Montoy IV*, 282 Kan. at 26.

Several years after *Montoy* was dismissed, the State began making significant cuts to Kansas' education funding, initially in response to the national economic downturn. In Fiscal Year 2009 the BSAPP appropriation was reduced from the 2006 legislature's statutorily specified amount of $4,443 to $4,400. And although the 2009 legislature had initially established BSAPP at $4,492 for fiscal year 2010 and beyond, the actual appropriation for fiscal year 2010 was reduced to $4,012.

After *Gannon* was filed in November 2010, legislative reductions in BSAPP-calculated spending continued. By fiscal year 2012—July 1, 2011 to June 30, 2012—the legislature had reduced BSAPP to $3,780. In total, the reduction to education funding through these BSAPP reductions constituted a loss of more than $511 million to local districts. *Gannon I*, 298 Kan. at 1114-15. Based upon this and other evidence, the panel concluded in its January 2013 decision that the legislature underfunded K-12 public education between fiscal years 2009 and 2012. 298 Kan. at 1110.

Issue 5: *The State's public education financing system provided by the legislature for grades K-12—through structure and implementation—is not reasonably calculated to have all Kansas public education students meet or exceed the standards set out in* Rose *and as presently codified in K.S.A. 2016 Supp. 72-1127.*

*Introduction*

After remand, the panel concluded that the Kansas financing system currently provided by the legislature for grades K-12 was not reasonably calculated through structure and implementation to have all public education students meet or exceed the *Rose* standards. The State now argues the panel (1) failed to apply the proper adequacy test; (2) failed to afford the proper deference to the legislature's policy decisions; (3) improperly shifted the burden of proof; and (4) reached the wrong conclusion. Subpoints to its general argument that the panel reached the wrong conclusion on adequacy will be discussed below.

*Standard of review*

Whether through structure and implementation the K-12 system is reasonably calculated to have all public education students meet or exceed the *Rose* standards presents a mixed question of fact and law. When an appellate court reviews these mixed questions, it applies a bifurcated standard of review. Insofar as any of the panel's factual findings are in dispute, the court applies a substantial competent evidence standard. "Substantial evidence is such legal and relevant evidence as a reasonable person might accept as sufficient to support a conclusion." *Gannon v. State*, 298 Kan. 1107, 1175, 319 P.3d 1196 (2014) (*Gannon I*).

38

In determining whether substantial competent evidence supports the district court's findings, appellate courts must accept as true the evidence and all the reasonable inferences drawn from the evidence which support the district court's findings and must disregard any conflicting evidence or other inferences that might be drawn from it. *Gannon I*, 298 Kan. at 1175-76 (citing *Unruh v. Purina Mills*, 289 Kan. 1185, 1195-96, 221 P.3d 1130 [2009]). Accordingly, appellate courts do not reweigh the evidence or assess the credibility of witnesses. *State v. Reiss*, 299 Kan. 291, 296, 326 P.3d 367 (2014).

The panel's conclusions of law based on those findings are subject to our unlimited review. 298 Kan. at 1176, 1182. The ultimate determination of whether the legislature is in compliance with Article 6, § 6(b) of the Kansas Constitution is a question of law. See *State v. Laturner*, 289 Kan. 727, 735, 218 P.3d 23 (2009) (constitutionality of statutes presents question of law over which Supreme Court exercises unlimited review).

As further explained below, we hold that the panel's findings of fact are supported by substantial competent evidence. And we agree with the panel's legal conclusion that the State has failed the constitutional requirement of adequacy.

*Discussion*

   *Threshold determinations*

We begin our analysis by recognizing that the legislature has the power—and duty—to create a school funding system that complies with Article 6 of the Kansas Constitution. *Gannon I*, 298 Kan. at 1146 (language of Article 6 both empowers and obligates the legislature to make suitable provision for finance of the educational interests of the State). In *Gannon I*, we explained that Article 6, § 6(b) contained minimum standards of adequacy which were met when the financing system provided by the

39

legislature for grades K-12—through structure and implementation—is reasonably calculated to have all Kansas public education students meet or exceed the standards set out in *Rose*. 298 Kan. at 1172. The *Rose* court held that:

> "[A] . . . system of education must have as its goal to provide each and every child with at least the seven following capacities: (i) sufficient oral and written communication skills to enable students to function in a complex and rapidly changing civilization; (ii) sufficient knowledge of economic, social, and political systems to enable the student to make informed choices; (iii) sufficient understanding of governmental processes to enable the student to understand the issues that affect his or her community, state, and nation; (iv) sufficient self-knowledge and knowledge of his or her mental and physical wellness; (v) sufficient grounding in the arts to enable each student to appreciate his or her cultural and historical heritage; (vi) sufficient training or preparation for advanced training in either academic or vocational fields so as to enable each child to choose and pursue life work intelligently; and (vii) sufficient levels of academic or vocational skills to enable public school students to compete favorably with their counterparts in surrounding states, in academics or in the job market." *Rose v. Council for Better Educ., Inc.*, 790 S.W.2d 186, 212 (Ky. 1989).

These standards are presently codified in K.S.A. 2016 Supp. 72-1127.

As a threshold matter, the State argues that in order to properly evaluate the constitutionality of the K-12 public education system we should apply a test in which we give the legislature "substantial—indeed, virtually conclusive—deference." In one of its variations on this overall theme, the State argues we should merely ask whether the actions it took after *Gannon I*'s release were reasonable and not arbitrary. In another variation on its theme, it likens our review to a "rational basis" test.

To support the State's argument, it first cites to *Morath v. The Texas Taxpayer and Student Fairness Coalition*, 490 S.W.3d 826, 845-46 (2016). There, the Texas Supreme Court examined the standard of review in its prior school finance decisions and the

deference owed to the Texas Legislature in determining the scope of the legislature's duty to provide "suitable provision" for public schools. 490 S.W.3d at 845-46; Tex. Const. Art. 7, §1. It outlined a "very deferential" review that would uphold lawmakers' actions if they merely were reasonable and not arbitrary. 490 S.W.3d at 846.

As in Texas, we start our review of a statute with a presumption of constitutionality. *Gannon I*, 298 Kan. at 1148. And we readily acknowledge it is not our province to consider the wisdom of legislative policy choices. "[T]he function of the court is merely to ascertain and declare whether legislation was enacted in accordance with or in contravention of the constitution—and not to approve or condemn the underlying policy." *Samsel v. Wheeler Transport Services, Inc.*, 246 Kan. 336, 348-49, 789 P.2d 541 (1990). See also *Gannon I*, 298 Kan. at 1140 (citing *Harris v. Shanahan*, 192 Kan. 183, 206, 387 P.2d 771 [1963] ["Courts have no power to overturn a law enacted by the legislature within constitutional limitations, even though the law may be unwise, impolitic, or unjust."]).

But as our decision in *Gannon I* has made clear, the State's demands for "virtually conclusive deference" to the legislature in Article 6 cases is not the appropriate mode of analysis for this court. The history of Kansas school finance litigation shows that the people have empowered the judiciary with determining whether the State has met the requirements of the constitution's education article. *Gannon I*, 298 Kan. at 1168 ("Just as only the people of Kansas have the authority to change the standards in their constitution, the Supreme Court of Kansas has the final authority to determine adherence to the standards of the people's constitution.") (citing *Harris*, 192 Kan. at 207); *Montoy III*, 279 Kan. at 826 ("[T]he final decision as to the constitutionality of legislation rests exclusively with the courts."); *U.S.D. No. 229*, 256 Kan. at 254-59 (judiciary has authority to determine whether K-12 finance system is "suitable" under Article 6, § 6[b]).

41

Moreover, our rejection of virtually conclusive deference to the legislature's enactments is consistent with how various other state supreme courts generally review their own state constitution education articles. See, *e.g.*, *Rose*, 790 S.W.2d at 209 ("To avoid deciding the case because of 'legislative discretion' . . . would be a denigration of our own constitutional duty. To allow the General Assembly . . . to decide whether its actions are constitutional is literally unthinkable."); *Lake View Sch. Dist. No. 25 v. Huckabee*, 351 Ark. 31, 54-55, 91 S.W.3d 472 (2002) (quoting and adopting this *Rose* language); *Claremont School Dist. v. Governor*, 142 N.H. 462, 475-76, 703 A.2d 1353 (1997) (*Claremont II*) ("[W]e were not appointed to establish educational policy, nor to determine the proper way to finance its implementation. That is why we leave such matters . . . to the two co-equal branches of government . . . [but i]t is our duty to uphold and implement the New Hampshire Constitution . . . ."); *Washakie County School Dist. No. One v. Herschler*, 606 P.2d 310, 319 (Wyo. 1980) ("Though the supreme court has the duty to give great deference to legislative pronouncements and to uphold constitutionality when possible, it is the court's equally imperative duty to declare a legislative enactment invalid if it transgresses the state constitution."). See also *Connecticut Coalition for Justice in Education Funding, Inc. v. Rell*, 295 Conn. 240, 266, 990 A.2d 206 (2010) ("'[I]t is well within the province of the judiciary to determine whether a coordinate branch of government has conducted itself' in accordance with the 'authority conferred upon it by the constitution.'"); *Idaho Schools For Equal Educ. v. Evans*, 123 Idaho 573, 850 P.2d 724 (1993) ("[W]e decline to accept the respondents' argument that the other branches of government be allowed to interpret the constitution for us."); *McCleary v. State*, 173 Wash. 2d 477, 530-40, 269 P.3d 227 (2012) (court evaluates the record for itself to determine if legislature is complying with constitutional duties).

Similarly, we reject the rational basis review which the State additionally champions. In support of its argument, the State cites *Downtown Bar and Grill v. State*, 294 Kan. 188, 273 P.3d 709 (2012), where we rejected the bar and grill's equal protection

42

argument. We held that instead of a State obligation to provide evidence for its decision, it was the bar's "obligation to negative every *conceivable* basis" for that decision. (Emphasis added.) 294 Kan. at 198. Almost all plaintiffs would be unable to meet this standard in litigation involving public education.

But even so, the plaintiffs here came close when the panel concluded in its December 2014 decision "that constitutional inadequacy *from any rational measure or perspective* clearly has existed and still persists in the State's approach to funding the K-12 school system." (Emphasis added.) It repeated this conclusion in its June 2015 decision ("[T]he adequacy of State K-12 funding through FY 2015 *was wholly constitutionally inadequate from any rational perspective.*") In sum, then, if the panel had expressly applied the "very deferential" *Morath* test requested by the State—merely reasonable and not arbitrary legislation—it still would have held the Kansas system to be constitutionally inadequate. See *Morath*, 490 S.W.3d at 863.

Our rejection of the State's insistence upon virtually conclusive deference to the legislature does not mean that deliberative body is without considerable discretion in satisfying the requirements of Article 6. As we said in *Gannon I*, "[O]ur Kansas Constitution clearly leaves to the legislature the myriad of choices available to perform its constitutional duty[.]" 298 Kan. at 1151. We followed this path—one granting deference but within proper bounds of judicial review—in our previous consideration of the State's equity compliance. *Gannon v. State*, 304 Kan. 490, 500, 372 P.3d 1181 (2016) (*Gannon III*) ("In our analysis, we do not dictate to the legislature how it should constitutionally fund K-12 public school education; we only review its efforts to ensure they do not run afoul of the Kansas Constitution.").

Consistent with our recognition of the proper amount of judicial deference due legislative enactments, in *Gannon I* we disagreed with the panel's refusal to give

lawmakers the "flexibility" to consider all funding sources utilized in its K-12 funding system, stating that on remand:

> "In the panel's assessment, funds from all available resources, including grants and federal assistance, should be considered. *The legislative history of Article 6 reveals the intent to provide a system of educational finance that is sufficiently flexible to be able to utilize such sources.* See Kansas Legislative Council, The Education Amendment to the Kansas Constitution, pp. 31-32 (Publication No. 256, December 1965) (noting '[t]he advisory committee emphasized that the legislature should have specific broader powers . . . in matching federal funds' and expressing intent that Article 6 provide 'greater flexibility . . . in . . . matching new federal and private grants')." (Emphasis added.) *Gannon I*, 298 Kan. at 1171.

In short, we reject the State's demand for virtually conclusive deference to the legislature's enactments when reviewing legislative compliance with Article 6.

Several other threshold points—some raised by the State and some by us *sua sponte*—also need to be addressed in this analysis.

First, as mentioned, in our mixed review we will analyze whether the findings of the panel's rulings—from January 2013 through June 2015—are supported by substantial competent evidence. *Gannon I*, 298 Kan. at 1175-76. And as also mentioned, the State has challenged—and we have rejected—both (1) the panel's refusal to open the record on remand and admit the State's proffered evidence and (2) the panel's consideration of the 2012-2013 scores on standardized tests maintained by the KSDE. So the question remaining and discussed below is whether the evidence actually admitted or judicially noticed by the panel is nevertheless sufficient to support the panel's numerous findings from December 2014 forward.

44

At the start of this review for substantial competent evidence, we briefly address the State's complaint that the panel "cherry picked" evidence it relied upon for its findings and that we should disapprove of that particular harvesting practice. This complaint and accompanying request are incompatible with our scope of review. In determining whether substantial competent evidence supports the lower court findings, appellate courts must accept as true the evidence and all the reasonable inferences drawn from the evidence which support the district court findings and must disregard any conflicting evidence or other inferences that might be drawn from it. *Gannon I*, 298 Kan. at 1175-76, 1185. We do not reweigh evidence or assess credibility of witnesses. *Reiss*, 299 Kan. at 296.

Moreover, any harm from this alleged cherry picking would be ameliorated, if not eliminated, by KSDE student achievement scores on standardized testing after 2012-2013 that both parties have invited us to judicially notice under K.S.A. 60-409 and K.S.A. 60-412. As explained below, these years' worth of scores do not contradict the panel's findings.

Second, in our mixed review, we will next consider the application of the law to the findings in order to make our own conclusions of law. *Gannon I*, 298 Kan. at 1176. At the beginning of this de novo review, we now address the State's complaint that the panel improperly placed the burden on the State to prove it had complied with Article 6. The State correctly notes that the burden shifts to the State only in the remedial phase of the litigation, and unlike the issue of equity in *Gannon I*, this court had not yet ruled on the constitutionality of adequacy—the issue before the panel on remand. See *Gannon I*, 298 Kan. at 1162. So the burden remains on the plaintiffs to show noncompliance.

We understand how some might construe the adequacy issue as being in the remedial phase. For example, the State's own brief argues that CLASS was passed "in prompt response" to the panel's December 30, 2014, decision holding the SDFQPA constitutionally inadequate. And it characterizes CLASS as "an approach that was

45

'reasonably calculated' to obtain compliance with the *Rose* standards" established by *Gannon I.* Nevertheless, the panel never expressly stated the State had the burden on remand to prove constitutional compliance on adequacy. And after examining the panel's decisions, we are convinced it did not shift the burden to the State.

In a similar vein, the State additionally complains that the panel applied the wrong test—which led to a flawed conclusion of constitutional inadequacy. A similar argument was made in *Gannon II*, where the State also claimed the panel had applied the wrong equity test. Based in part upon the panel's language in stating the test, we rejected the argument:

> "In addition to explicitly stating it would proceed under Option B, the panel quoted the language of the *Gannon I* equity test several times. So we may presume it applied the proper test. *Rush v. King Oil Co.*, 220 Kan. 616, 624-25, 556 P.2d 431 (1976) (when apparent from the record the district court was aware of proper legal test to be applied, appellate court presumes it applied proper test); see *Unwitting Victim v. C.S.,* 273 Kan. 937, 947, 47 P.3d 392 (2002); *Hegwood v. Leeper*, 100 Kan. 379, 383, 164 P.173 (1917)." *Gannon v. State*, 303 Kan. 682, 711, 368 P.3d 1024 (2016) (*Gannon II*).

Here, on remand, the panel recited the *Gannon I* test multiple times, most significantly in the conclusion of its December 2014 decision regarding the SDFQPA's inadequacy:

> "Accordingly, paraphrasing the textual premise of the Kansas Supreme Court's Remand Order, we find the Kansas public education financing system provided by the legislature for grades K-12—through structure and implementation—is not presently reasonably calculated to have all Kansas public education students meet or exceed the *Rose* factors. As we have analyzed, it is inadequate from any rational perspective of the evidence presented or proffered to us."

This conclusion based upon the *Rose* standards was essentially confirmed in the panel's June 2015 conclusion concerning CLASS's inadequacy: "House Substitute for SB 7, by its failure to provide funding consistent with the needs found in our Opinion of December 30, 2014, and *by freezing the inadequacy we found existing through FY 2015 for FY 2016 and FY 2017*, also stands, unquestionably, and unequivocally, as constitutionally inadequate in its funding." (Emphasis added.)

We further observe the panel's express clarification that, in effect, it also had applied the *Rose* test in its pre-*Gannon I* decision of January 2013. "[I]f doubt exists, we always intended to speak in this case implicitly in regard to K.S.A. 72-1127(c) and the *Rose* tenets it emulated." The panel particularly noted that the 2006 Legislative Post Audit Study it substantially relied upon "was premised on meeting the *Rose*-mirrored goals set out by K.S.A. 72-1127(c) enacted in the 2005 legislative session. We found the results of that study substantially authenticated and supported, in dollar terms, what was needed to meet the K.S.A. 72-1127(c) standards." Accordingly, its application of the *Gannon* test in December 2014 did not change the inadequacy conclusion it previously reached in January 2013 when applying the *Rose* tenets. Nor, as mentioned, was the CLASS inadequacy conclusion of June 2015 based upon non-*Rose* factors.

The panel also concluded "that constitutional inadequacy [existed] from *any rational* measure or perspective"—one test which the State itself has argued is a proper review for adequacy after *Gannon I*. (Emphasis added.) See *Morath*, 490 S.W.3d at 863 ("We must uphold the Legislature's determination unless it is arbitrary and unreasonable."). Based upon these and other facts, the State has not convinced us that the panel reached the wrong conclusion on remand by applying the wrong test.

But even if the panel had improperly shifted the burden to the State, and even if it had applied the wrong test for determining adequacy, the State's next argument makes both alleged mistakes irrelevant. Specifically, consistent with its position in *Gannon I*,

47

the State also argues that because our appellate review is de novo, we can apply the proper test to the findings ourselves and form our own conclusions. It cites *Hall v. Kansas Farm Bureau*, 274 Kan. 263, 273, 50 P.3d 495 (2002), to declare, "[A]n appellate court may affirm a lower court judgment that relied on the wrong legal standard if factual findings support judgment under the correct legal standard." We agree with the State, for as we said when addressing an analogous situation in *Gannon I*:

> "But just as the panel analyzed capital outlay, here it too *may have applied* a test of 'zero tolerance' for any wealth-based disparity, *i.e.*, perhaps requiring the same standard, or higher, under equal protection law that we rejected in prior school finance decisions. *Nevertheless, after applying our test we conclude that the level of wealth-based disparity inherent in the LOB equalizing mechanism became an unreasonably disparate level due to the proration of supplemental general state aid beginning in fiscal year 2010.*" (Emphasis added.) *Gannon v. State*, 298 Kan. 1107, 1188, 319 P.3d 1196 (2014) (*Gannon I*).

So even assuming the panel made these purported mistakes regarding the test and its application, we agree that our de novo review of legal conclusions allows us to apply the *Gannon I* test ourselves and to keep the burden on the plaintiffs where it belongs.

### *CLASS's structure violates Article 6.*

In *Gannon I* we instructed that "the panel must assess whether the public education financing system provided by the legislature for grades K-12—through structure and implementation—is reasonably calculated to have all Kansas public education students meet or exceed the standards set out in *Rose* [citation omitted] and as presently codified in K.S.A. [2016] Supp. 72-1127." 298 Kan. at 1199-1200. In determining whether this test has been met, we first examine structure.

We conclude as a matter of law that CLASS fails this requirement because it does not profess to be a school finance formula. The State quotes the governor's State of the State message of January 2015 that was delivered 2 weeks after the panel declared the SDFQPA to be funded below constitutionally adequate levels. His language supports our conclusion: "[T]he legislature should repeal the existing school finance formula [SDFQPA] and allow itself sufficient time to write a new modern formula," *i.e.*, until June 2017. So instead of CLASS creating a replacement finance formula, its block grants are just a funding stopgap and merely freeze the K-12 funding levels for fiscal years 2016 and 2017 at the levels for fiscal year 2015. *Gannon II*, 303 Kan. at 694. Moreover, they are only minimally responsive to financially important changing conditions such as increased enrollment, in general or by subgroup—which can include those "to whom higher costs are associated." See *U.S.D. No. 229 v. State*, 256 Kan. 232, 244, 885 P.2d 1170 (1994).

*CLASS implementation violates Article 6.*

To determine whether the *Gannon I* test for adequacy is being met through implementation, it is appropriate to look—as did the panel—to both the financing system's inputs, *e.g.*, funding, and outputs, *e.g.*, outcomes such as student achievement. See *Montoy v. State*, 279 Kan. 817, 840, 843, 112 P.3d 923 (2005) (*Montoy III*). The Legislative Post Auditor confirmed this was the approach taken by the LPA cost study: In her transmittal letter to members of the Kansas Legislature in January 2006, the auditor wrote, "This report contains the results of both the input-based and outcomes-based studies of K-12 education costs mandated by the 2005 Legislature."

Other state supreme courts have utilized the dual approach of examining inputs and outputs. The Supreme Court of Arkansas evaluated the adequacy of its state's school system following the legislature's adoption of many of the *Rose* capacities as the minimum requirements of the state's K-12 structure. The court looked not only to the

49

level of expenditures for the education of its students and the resources available to its districts, but also the performance of its students on various educational benchmarks. *Lake View v. Huckabee*, 351 Ark. 31. Similarly, in *Rose*, the Kentucky Supreme Court examined the quality of curricula provided to its students—including whether such courses like music, art, and foreign languages were offered—and expert opinion on whether the state's overall effort was adequate to meet the goals set out in that decision. The court also compared its state schools' performance with others' on national standardized testing and evaluations. 790 S.W.2d at 197-98. *Cf. DeRolph v. State*, 78 Ohio St. 3d 193, 677 N.E.2d 733 (1997) (court looked at deficiencies in one-half of state's school buildings, schools' lack of funds to purchase textbooks, and evidence that Ohio students' performance on test scores was poor overall).

Accordingly, we will first look at whether the evidence in the record demonstrates that the funding levels and other resources produce an education system reasonably calculated to achieving those *Rose* standards. Then second, we will also look to the results of the State's input efforts to determine to what degree these standards are actually being met—as this would be a strong signal as to whether the system as a whole is reasonably calculated to achieve them. Contrast *Gannon I*, 298 Kan. at 1163 (explaining that prior decisions' focus on cost estimate studies arose from the cases' specific circumstances). The State heavily emphasizes outputs, again quoting the Texas Supreme Court, "Because the adequacy standard 'is plainly result-oriented,' the proper focus of a constitutional adequacy analysis should be on outputs that measure student performance." *Morath v. The Texas Taxpayer and Student Fairness Coalition*, 490 S.W.3d 826, 863 (2016).

Here, the record on appeal provides ample evidence of the inputs of our state's education system, *i.e.*, resources allocated. It also provides ample evidence of outputs— *i.e.*, the actual performance of our K-12 public education students. So we now turn to

evaluate whether this evidence exhibits a school system that meets the requirements of Article 6.

*The panel's findings are supported by substantial competent evidence.*

The panel's December 30, 2014, decision included an adoption of its January 2013 findings of facts and conclusions of law, with some amendment. After considering the prior record, its prior findings, and the State's proffered evidence on remand—and after taking judicial notice of matters such as student achievement scores on standardized testing for school year 2012-2013—the panel essentially reaffirmed its position regarding statewide inputs and outputs:

> "[W]e found [in January 2013] the Kansas K-12 school financing formula constitutionally inadequate in its present failure to implement the necessary funding to sustain a constitutionally adequate education *as a matter of current fact* as well as the precedent facts that supported the *Montoy* decisions. *That is still our opinion*." (Emphasis added.)

En route to this affirmation, the panel found, as it had with a specific finding in January 2013, that the infusion of additional money into the K-12 educational system after *Montoy IV* in 2006 "was making a difference." The panel found this was evidenced by considerable progress in student achievements until it began to waver during the 2011-2012 school year once the residual effects of the *Montoy* extra funding wore off after cuts began in 2009. The panel spent considerable effort reviewing several years' worth of KSDE student achievement statistics—for all students and for subgroups—through 2012-2013, which helped lead it to find that achievement actually declined as funding decreased. It also specifically examined how, if at all, the *Rose* standards were being met in the state. Ultimately, the panel reiterated that "the reduced funding status discussed in the original trial court *Gannon* opinion still exists."

51

The findings of the panel were based on expert and lay testimony at trial, as well as numerous exhibits and evidence presented by both the plaintiffs and the State and facts of which it took judicial notice. We hold the panel's findings are supported by substantial competent evidence. And as explained below, its findings are not inconsistent with the numerous facts we judicially noticed at the parties' request, including the most recent years' worth of both inputs and outputs—such as student achievement scores on standardized tests.

*Inputs*

In its analysis regarding funding inputs, the panel considered and averaged several cost studies—including the 2006 LPA study. But it rejected or heavily discounted several sources of funding presented by the State.

The State's brief characterizes what it believes to be the panel's faulty analytical progression, *i.e.*, erroneously treating the cost studies' conclusions regarding appropriate BSAPP levels as the benchmark for constitutional compliance and erroneously failing to give credit for all funds provided by the state and federal governments:

> "The averaged actual cost studies measure the education required under the *Rose* standards. An average of the studies sets a floor for adequate funding of the education necessary under Article 6; Federal and LOB funds are not considered in whether adequate funding exists, Kansas K-12 funding is less that [*sic*] that floor, particularly when federal and LOB revenue is ignored; and, Therefore, present funding is unconstitutionally inadequate."

Regarding consideration of funding inputs on remand, in *Gannon I* we instructed that "[i]n the panel's assessment, funds from all available resources, including grants and federal assistance, should be considered." 298 Kan. at 1171. We acknowledge, as the plaintiffs have argued, that we also authorized the panel to consider any limitations on

52

these funds. 298 Kan. at 1171-72 ("The panel may consider the restrictions on the use of these federal, pension, and other funds and determine that even with the influx of these additional monies the school districts are unable to use them in the manner necessary to provide adequacy under Article 6."). But the panel should have given greater consideration and some value to the other various sources of funds and not rejected their applicability to the adequacy calculus.

For example, the panel rejected LOB funds as a "constitutionally adequate funding source" because the LOB "statutory funding design is optional and voluntary as to both its existence and in the dollar contribution to be made by it." We note that according to the State's latest brief, the statewide LOB budget for fiscal year 2016 was $1,061,277,923. And as we have previously noted, LOB funds are generally unrestricted in their use by local districts, which means such funding can directly supplement BSAPP spending. See *Gannon v. State*, 304 Kan. 490, 506, 372 P.3d 1181 (2016) (*Gannon III*). Indeed, we have recognized the legislative record reveals that LOB funds now pay for nearly one-fourth of the districts' basic operating expenses. 304 Kan. at 507. But we additionally note to the panel's credit that it appeared to alternatively determine that even if LOB funding was included, the system would still be unconstitutional.

As for federal funds, the panel held they were not properly included in any measure of adequacy because, among other things, many were "limited in use." It found that as with the LOB, federal funds were not uniform throughout the state and the amounts were not guaranteed to the districts. We note that according to the State's brief, for fiscal year 2015 federal funds statewide totaled $510,199,401. And we additionally note the positive impact of such funding was specifically recognized by the panel when it described the improved student achievement in those schools receiving additional federal funds such as Emerson Elementary, which, as discussed below, the panel highlighted as one example of where "money makes a difference." As with the LOB, the panel should

53

have given those federal funds some level of value in its determination of the adequacy of the state's K-12 financing system.

The same shortcoming holds true for KPERS. As we advised the panel on remand in *Gannon I*, "state monies invested in the Kansas Public Employees Retirement System [KPERS] may also be a valid consideration because a stable retirement system is a factor in attracting and retaining quality educators—a key to providing an adequate education." 298 Kan. at 1171. We acknowledge the State's practice of placing those funds, *i.e.*, employer contributions, in school districts' treasuries where they merely pause before being forwarded to KPERS—an act described as a simple "pass-through" that the State argues helped it to create "record high levels" of funding for education. And we further observe these funds do not affect the districts' ability to operate on a day-to-day basis or increase the retirement benefits. Nevertheless, we also acknowledge that by whatever route the funds travel, or for however briefly they stay in the districts' treasuries, they ultimately have some value to the thousands of individual recipients in the education system and help to create a competitive hiring environment for Kansas schools. 298 Kan. at 1171. After the panel considered KPERS funds, it should have given them some level of value in the adequacy analysis, even if that value is ultimately determined to have insufficient impact on the *Rose* standards to offset other problems created by CLASS.

Turning to the various cost studies, the State has objected to the panel's reliance on them and its accompanying emphasis upon reductions to the BSAPP as contrary to *Gannon I*, where we held that the panel over-relied on "actual costs" and gave too much weight to the empirical evidence on costs. But to currently provide a fuller picture, we also instructed that "[n]evertheless, actual costs remain a valid factor to be considered during application of our test for determining constitutional adequacy under Article 6." 298 Kan. at 1170. And as discussed below, the changes made to the state's K-12 system specifically through reduction in BSAPP funding had a pronounced effect on local districts' ability to meet the *Rose* standards—even when considering any purported

54

increases to other sources of funding. So it was appropriate for the panel to look at BSAPP reductions and cost studies. Accordingly, we do not completely agree with the State's characterization of the panel's ladder of analysis, *i.e.*, that the panel considered the averaged cost studies and BSAPP levels as the litmus test for Article 6 compliance.

Any panel infirmities regarding funding, however, must be placed in context because "total spending is not the touchstone of adequacy." *Gannon I*, 298 Kan. at 1172. Acknowledging this reality, the panel went further than simply measuring the amount of funds available to districts. It looked at what effects state reductions in BSAPP had on actual resources, such as staff, class sizes, and student opportunities. See 298 Kan. at 1172 (panel can consider how allocation of financial resources impacts State's ability to meet *Rose* standards).

In its extensive examination, the panel found that every witness, including experts, who testified on the subject confirmed that the costs of educating Kansas students and the demands on Kansas education had only increased since 2007. The panel found, based on this testimony, that while the demands on schools increased—including the size of student populations—the available resources declined, creating a gap between demands and resources in Kansas public education.

During this same period, the panel found that the BSAPP—a primary factor in calculating funding of the basic education costs in the districts—was reduced to $3,780. This reduction, the panel noted, was in direct opposition to the recommendations of several expert bodies. The Kansas State Board of Education (SBE), at its annual July meetings from 2009 to 2014, unfailingly recommended that the legislature fund the BSAPP at $4,492. Additionally, the SBE recommended that the state increase funding for such programs as professional development, school lunch programs, capital outlay, and extracurricular agendas. The Kansas 2010 Commission recommended in its annual reports from December 2007 through its last report in 2010—like the SBE—that the

BSAPP be set at $4,492. It also recommended that this amount be adjusted annually for inflation. See *Montoy v. State*, 282 Kan. 9, 23, 138 P.3d 755 (2006) (*Montoy IV*) (noting legislature's creation of 2010 Commission "to conduct extensive monitoring and oversight of the school finance system").

Finally, the A & M and LPA studies—both also commissioned by the legislature—performed exhaustive review of the state's school finance system. They both recommended funding BSAPP levels well above this $3,780 amount and similar to those of the 2010 Commission and the SBE. As mentioned, the panel found the legislature particularly tasked the 2006 LPA study with estimating the cost of educating Kansas children to meet the goals then set out in 72-1127, which we previously found appeared to represent a deliberate decision by the Kansas Legislature to match the *Rose* capacities—the minimum standards of an adequate public education system under Article 6, § 6(b). *Gannon I*, 298 Kan. at 1167.

After reviewing the evidence from trial, the panel found that because of the funding cuts beginning in 2009, districts were required to eliminate programs and services directly beneficial to the achievement of the *Rose* standards. Based on testimony from Kansas administrators, principals, and teachers, the panel further found that certain successful strategies and methods exist that can improve student achievement and extend learning opportunities, such as longer school days, Saturday school, all-day kindergarten, before and after school programs, extracurricular activities such as speech and debate, band and orchestra, smaller class sizes, professional development, and the employment of qualified teachers.

The witnesses established that such school programs going beyond the basics of math and English Language Arts (ELA)—which includes reading, writing, literature, communication, and grammar—are known to be successful educational approaches that produce consistent progress and achievement of academic success. As the *Rose* standards

and the education goals of the legislature (K.S.A. 2016 Supp. 72-1172) illustrate, K-12 education includes teaching students appreciation for the arts, music, and sports as well as the ability to interact with each other and the rapidly developing world around them. Expert witnesses explained these attributes of a quality education are integral and must be a part of the state's K-12 system for it to meet the constitutional requirements of Article 6. The panel again found that because of the cuts in funding by the State after 2009, districts were forced to eliminate or reduce such programs to the detriment of their students. Among the examples found by the panel from the evidence at trial about funding reductions from across the state were removing 10 high school librarians in Wichita; eliminating afterschool programs for 600 students at Dodge City's Northwest Elementary, as well as ending field trips at that same school; the loss of band and orchestra programs at Wichita's Dodge Literacy Magnet School; and cutting Spanish, art, and family consumer sciences courses at Kansas City's West Middle School.

The panel also found the 2009 budget cuts forced school districts statewide to cut 2,500 positions—including 1,567 for teachers. These reductions undoubtedly increased class sizes because they occurred when statewide full-time enrollment was increasing. Additionally, teacher salaries remained largely stagnant, while some had to be reduced.

In its findings the panel cited to the State's own expert witness, Dr. Eric Hanushek, who testified, "the most important factor influencing student achievement is the quality of the teacher." As we acknowledged in *Gannon I*, quality educators are a key to providing an adequate education and money plays a role in their employment. See 298 Kan. at 1171 (noting state monies invested in a stable retirement system is a factor in attracting and retaining quality educators). Accordingly, pay cuts or salary freezes can affect the quantity and quality of teachers a school system employs and therefore directly impact the system's ability to achieve the *Rose* standards.

Additionally, smaller class sizes, as the panel found through expert testimony, are an effective tool for increasing student achievement. See *Abbott by Abbott v. Burke*, 153 N.J. 480, 558, 710 A.2d 450 (1998) (smaller class sizes provide higher quality of educational experience); *Campaign for Fiscal Equity v. State*, 187 Misc. 2d 1, 52, 719 N.Y.S.2d 475 (2001) ("smaller class size can boost student achievement . . . . The advantages of small classes are clear. A teacher in a small class has more time to spend with each student. . . . Student discipline and student engagement in the learning process improve in smaller classes."); *Campbell County School Dist. v. State*, 907 P.2d 1238, 1278 (1995) (Wyo. 1995) (small class sizes are indicia of educational opportunity).

As the panel found, these cuts also impacted other staff members and extracurricular functions of the K-12 system that are vital to the achievement of the *Rose* standards. These include the first *Rose* standard, "sufficient oral and written communication skills to enable students to function in a complex and rapidly changing civilization"; the fourth standard, "sufficient self-knowledge and knowledge of his or her mental and physical wellness"; and the fifth standard, "sufficient grounding in the arts to enable each student to appreciate his or her cultural and historical heritage"—all of which are directly served by staff members such as librarians, speech therapists, paraprofessionals, coaches, and counselors. See 790 S.W.2d at 212.

The panel found such positions were reduced or eliminated based on an inability of the districts to properly fund them. For example, for the 2009-2010 school year, school districts eliminated 234 coaching positions and cut over 500 paraprofessionals. Stony Point South Elementary in Kansas City lost specialist teachers who work one on one with students having difficulty, and all tutoring programs. According to Kim Morrissey, a physical education teacher in Wichita, because of financial constraints her elementary school was forced to double the size of its physical education classes. Additionally, due to a lack of funding, the school was unable to continue the employment of a needed school nurse, social worker, and student counselor. Instead, through a form of triage, her

school would hire only one of these staff members on an annual basis, making its choice based on which service was needed by the greatest number of students during the upcoming school year.

The panel also found that budget constraints additionally impacted other elements of *Rose* standards two and three. They forced schools to cut vital programs that help students gain "'sufficient knowledge of economic, social, and political systems to enable [them] to make informed choices'" and "'sufficient understanding of governmental processes to enable the student to understand the issues that affect his or her community, state, and nation.'" *Gannon v. State*, 298 Kan. 1107, 1164, 319 P.3d 1196 (2014) (*Gannon I*). According to Wyandotte High School principal Mary Stewart, when short on funding, schools first cut political science and social studies activities and staff members. Unlike math and ELA, those courses are not as integral to student success on the standardized testing required by the state. But students' education in these areas is also often advanced and supplemented by field trips and other activities that provide children the opportunity to interact with their community in a meaningful way. Because of the funding shortfalls shown at trial, these opportunities have dwindled or become unavailable.

Finally, the panel found that because of lack of funds a number of schools have had to cut access and training in technology and vocational studies. As one example, in 2011-2012, the Wichita district experienced a $1.6 million decrease in its technology education budget. The panel found such cuts directly impacted the achievement of the sixth and seventh *Rose* standards: "sufficient training or preparation for advance training in either academic or vocational fields so as to enable each child to choose and pursue life work intelligently; and sufficient levels of academic or vocational skills to enable public school students to compete favorably with their counterparts in surrounding states in academics or in the job market." See 790 S.W.2d at 212.

Substantial evidence—including evidence discussed below in the outputs section demonstrating that student achievement rose when funding increased after *Montoy IV* in 2006 but eventually fell when funding began to decrease in 2009—ultimately helped lead the panel to make a finding that "money makes a difference" in public education. As additional evidentiary support, it cited Kansas cost studies, particularly the legislature's LPA study of 2006. That study concluded, with "99% confiden[ce]," that the relationship between student performance and district spending was positive, *i.e.*, that a 1% increase in student performance was associated with a .83% increase in spending. And the legislatively-created 2010 Commission concluded that "Kansas students have made great academic strides . . . *largely due to the infusion of school funding*." (Emphasis added.) See also Kansas Legislative Council, *The Education Amendment to the Kansas Constitution*, p. 30 (Publication No. 256, December 1965) ("'Financing' is one of the major ways to effect changes in educational policy.").

Illustrative of the substantial competent evidence supporting the panel's finding of a correlation between funding and student achievement in the state is Emerson Elementary School of Kansas City, with a demographic breakdown of approximately 50% African American and 48% Hispanic students. Dr. Cynthia Lane, the district's superintendent, testified that in 2009 Emerson had been declared the worst performing elementary school in Kansas. But new funding through federal grants led to implementation of programs and policy changes that helped dramatically increase student achievement. After 3 years, students moved from math and ELA state proficiency rates of 30% to 85%. Contrast *Morath v. The Texas Taxpayer and Student Fairness Coalition*, 490 S.W.3d 826, 851-53 (2016) (plaintiffs did not prove that achievement "gaps of ELL and economically disadvantaged students . . . could be eliminated or significantly reduced by allocating a greater share of funding to these groups"). We acknowledge the State presented trial testimony and argument offering contrary views about the Emerson Elementary experience. But the panel resolved those differences in plaintiffs' favor after

hearing the evidence and making determinations in its role as fact finder. Its resolution of these arguments is also supported by substantial competent evidence.

As mentioned, the resources available to school districts must be placed in context. And the State contends that outputs, not these imperfect inputs, are the most important—if not the sole—consideration in looking for adequacy, citing *Morath*. "An adequacy determination should not depend on 'inputs' such as funding per student; instead, the determination is 'plainly result-oriented,' looking to 'the results of the educational process measured in student achievement.'" 490 S.W.3d at 850.

We disagree with the State to the extent it would have us disregard—or greatly discount—the panel's factual findings detailing the loss of vital resources and its additional finding that this occurred as a result of cuts to state funding through reductions in BSAPP levels. Certainly, funding levels would not warrant much scrutiny if student achievement across the demographic landscape were demonstrably high. But as we discuss below, the outputs as found by the panel ultimately have declined since the State's cuts to BSAPP occurred—despite the State's declarations of "record high levels" of funding from all sources.

Moreover, despite some panel frailties we have identified, it is important to recognize that the legal conclusions to be derived from its findings remain ours. This recognition severely dilutes, if not eliminates, the importance of the panel's consideration, or refusal to accept, some of these factors about which the State objects. See *Gannon I*, 298 Kan. at 1176 (panel's conclusions of law based on its findings are subject to our unlimited review).

*Outputs*

The resources available to Kansas educators are legitimate and helpful measurements of whether the state's K-12 system is reasonably calculated to meet or exceed the *Rose* standards. But because total spending is not dispositive of adequacy, the parties appropriately produced a lot of evidence showing the outcomes of the state's public education system over the years leading up to trial, *i.e.*, "outputs." This evidence took the form of such things as student scores on various standardized testing, college entrance exams, and graduation rates published by the KSDE.

Regarding this evidence, the State argues that on the whole Kansas' K-12 education system has shown great improvement in student academic success—including all grades and all "subgroups" of students—from 2003 until the 2011-2012 school year. The evidence presented by the State shows a marked improvement during this period.

For example, during the 2003-2004 school year, of all Kansas students tested in reading, 70.5% scored proficient for their grade level. The State argues this percentage improved to 80.3% during the 2005-2006 school year and increased to 87.6% for the 2011-2012 school year. In math, 65.3% of all tested students scored proficient in their grade level during the 2003-2004 school year, but by 2011-2012, this percentage had improved to 85.9%. We observe that the information for the 2011-2012 report is noted as "preliminary data" in the parties' briefs. But both sides repeatedly cite to those percentages, and we accept them for the purposes of measuring student achievement during that school year.

The State argues that by 2011-2012 the "achievement gaps" existing between (1) all students and (2) certain student subgroups had narrowed. It contends every subgroup had been below 65% proficient in math in 2005-2006, and by 2011-2012 that number had "climbed" above 65%—with an average increase of 15 percentage points.

And for reading, every subgroup had been below 70% in 2005-2006, and by 2011-2012 that number had risen above 70%—with an average increase of at least 10 percentage points.

The State further points out that when reviewing the results of 4th and 8th grade students tested through the National Assessment of Educational Progress (NAEP)—often called the Nation's Report Card—Kansas has scored higher than the national average since 2003. The State also emphasizes that to demonstrate "more Kansas students are prepared for college than in the past," Kansas ranks above average in the nation for the takers of the ACT college entrance examination who meet the College Readiness Benchmarks. And in assessing student performance through remediation rates, Kansas scores for college-bound students rank in the top 10 of all states and have improved over the last 15 years.

Additionally, the State argues high school graduation rates have improved in all subgroups and overall from 80.7% in 2010-2011to 85.5% in 2013-2014. Finally, the State also points out that all schools are now accredited.

We acknowledge these improved achievements between 2003 and 2011-2012 as laudable and encouraging to any observer who believes a school system can be improved with effort. But as the panel found, they came during increased funding—and its aftermath—as a result of extensive litigation in *Montoy* over the same questions of adequacy we are concerned with today. These funding increases through the SDFQPA were rolled back beginning in 2009. See *Gannon I*, 298 Kan. at 1114. And as the panel found through substantial competent evidence, student achievement began to "falter" around 2011-2012 and declined in 2012-2013—for "all students" assessed and especially for "subgroups"—as programs and strategies designed, and known, to be successful in accomplishing the *Rose* standards were reduced or eliminated. Contrast *Morath*, 490 S.W.3d at 864-68 (over time, tests show mixed results, with some improvement and some

regression, helping lead court to conclusion system was constitutionally adequate). The panel found that these declines in achievement were attributable to the decrease in funding.

At the outset, we recognize the 2012-2013 school year results of standardized testing were contained in the KSDE information the panel considered—to which the State objected as "anomalous"—and noted with caution from the KSDE. But more KSDE report cards with even more recent testing information have been issued since the panel's decision.

Both parties invited us in their briefs and at oral arguments to judicially notice this updated KSDE data. Generally, this court is authorized to accept the parties' invitation to take judicial notice of facts not before the panel. See K.S.A. 60-412(c) ("The reviewing court in its discretion may take judicial notice of any matter specified in K.S.A. 60-409 whether or not judicially noticed by the judge."); *Harris v. Shanahan*, 192 Kan. 183, 207, 387 P.2d 771 (1963); K.S.A. 60-412(d). As mentioned, courts can take judicial notice of statistics compiled and published by a state department. See, *e.g.*, *Harris*, 192 Kan. at 207.

The KSDE has not published data for the 2013-2014 school year because of security issues with the server that held the department's data and an inability to vouch for their accuracy. But we take judicial notice of the numerous scores from standardized testing collected and published for the 2014-2015 and 2015-2016 school years.

This updated data is not contrary to the panel's December 2014 findings, *e.g.*, "the impact of the loss of funding was endemic, systemic, and statewide." Nor does it contradict the panel's finding of declining achievement, and often failure, among thousands of Kansas school children. Indeed, it appears to demonstrate a steady regression from the student improvements appearing from 2003 until the 2011-2012

school year. Finally, the updated data is not inconsistent with the panel's finding that many of the "all student" averages emphasized by the State hide a pernicious problem, *i.e*., an "achievement gap," between all students and subgroups of students.

The State cautions that the statistics for these 2 particular years come after a change in school curriculum and testing standards statewide. Prior to this change, students were tested using a five-tiered system that grouped test takers into the categories of "academic warning, approaches standards, meets standards, exceeds standards, or exemplary." Those students achieving only "academic warning" or "approaches standards" were considered to be falling below proficiency for their grade level in the subject tested, *e.g*., math or reading.

The new testing standards group students into four achievement levels. Level one is students who are not performing at grade level in the given subject. Level two comprises students who, while performing grade level work, are not doing so at a level of rigor considered "on-track" for college success. Level three is made up of students performing grade level work and are on track for college readiness. Level four are those students who perform above expectations.

We note the differences in nomenclature between the testing mechanisms over the relevant years. But we need not resolve these methodological concerns to a fine point for several reasons. First, unlike its cautionary communication for the 2012-2013 test results, the KSDE has not issued any such communication for these latter years. More important, all of the KSDE's measurements are still designed to determine student achievement according to its chosen standards, regardless of how they may be described at any time. No party has challenged that department's ability or authority to adopt various standards or tests which, in the view of its professionals, help accurately measure student performance, *e.g*., proficiency, for any given year. Nor has any party disputed the

accuracy of the results of those tests as recorded by the KSDE—other than perhaps the State's complaint about the "anomalous" results of 2012-2013.

We observe that the KSDE operates at the direction of the SBE. See K.S.A. 72-7701 (creating State Department of Education and placing it under administrative control of the commissioner of education as directed by law and by SBE). Moreover, the elected members of the SBE have been entrusted by the legislature with developing curriculum so Kansas public school students can meet *Rose* standards—curriculum required to be taught in every accredited school in the state. K.S.A. 2016 Supp. 72-1127. It logically follows that tests would be created or adopted to measure whether Kansas students are performing at appropriate levels of this curriculum.

We acknowledge the KSDE can sometimes change the labels for the student performance standards, the level of skills needed to meet those standards, and even the tests for measuring performance against those standards. But through it all, the underlying purpose of the standards remains constant:  here, to determine educational proficiency in any given year. Accordingly, the basic standard of measurement by the state's education department remains consistent for purposes of appellate review.

*KSDE testing of reading for all grades from 2011-2012 to 2015-2016*

According to KSDE standards and testing in 2011-2012, although 12.4% of all Kansas students tested in all grades did not meet the state's own minimum standards for proficiency in ELA, *e.g*., reading, more than twice that percentage of all African American students—28.9%—failed to do so. KSDE reported that percentage for African Americans as 31.6% in 2012-2013, 40.8% in 2014-2015, and 44.7% in the 2015-2016 school year. According to this latest data, when calculated by number of students, nearly one-half of our state's African American students are not proficient in reading.

In 2011-2012, 22.1% of all Hispanic students did not meet the state's minimum standards for proficiency in reading. Four years later, the percentage failing to meet the standards set for that year was 36%. In short, more than one-third of all Hispanic students are not proficient in reading.

To put these figures into a meaningful frame of reference, during the last school year more than 33,000 Hispanic students and 15,000 African American students statewide performed below grade level in a subject at the heart of an adequate education. Combined, those underperforming students equate to approximately all the K-12 public school students "in every school district in every county with an eastern boundary beginning west of Salina"—more than one-half of the state's geographic area.

During this same 4-year period of testing, KSDE reported the percentage of all ELL students who did not meet the state's minimum standards as 28.2% in the first year and 43% in the last, and the percentage of all disabled students who did not meet the minimum standards as 28.8% and 57.9%, respectively. Finally, the percentage of all students receiving free and reduced lunches who did not meet the minimum standards was initially 20.2% and then 34.8%.

During this same time frame, the percentage for *all* students performing below grade level initially was 12.4% with 23.3% in 2015-2016. Stated simply and starkly, while Kansas fails to provide nearly one-fourth of all its public school K-12 students with the basic skill of reading, the proficiency data for 2015-2016 reflected a continuation of an achievement gap between all students and the subgroups that existed under the standards set for the 2011-2012 school year.

We acknowledge that some subgroups can have their own special challenges to achievement. See *Morath*, 490 S.W.3d at 859-60 ("The plaintiffs concede that economically disadvantaged students face challenges outside the schools that affect their

67

educational achievement."). However, their particular hurdles do not satisfactorily explain why today nearly one-fourth of all Kansas students are not proficient in reading; the panel held the fuller explanation lies in a finance system that is not reasonably calculated to have all Kansas public school students meet or exceed the standards set out in *Rose* and presently codified in K.S.A. 2016 Supp. 72-1127. When multiplying the total number of students statewide in 2015-2016 by the rate of those below proficient in reading (23.3%), the result is approximately 113,000 students.

*KSDE testing of math for all grades from 2011-2012 to 2015-2016*

The KSDE standardized testing results for math show that for all students in 2011-2012, 14.1% did not meet the state's own minimum standards for proficiency, compared to African American students at 32.3%. KSDE reported that percentage for African Americans to be 40.9% in 2012-2013, 41.9% in 2014-2015, and 48.7% in the 2015-2016 school year. In other words, nearly one-half of our state's African American students are not proficient in math.

In 2011-2012, 22.2% of all Hispanic students did not meet the state's minimum standards for proficiency in math. Four years later, KSDE reported that percentage as 38.7%. In short, more than one-third of all Hispanic students are not proficient in math. And during this same period of testing, KSDE measured the percentage of all ELL students who did not meet the minimum standards as 24.8% in the first year and 42.8% in the latter school year.

For all disabled students, KSDE reported the percentage who did not meet the state's minimum standards as 31% in the first year and 60.7% in the last, and the percentages of all students receiving free and reduced lunches who did not meet the standards were reported as 21.8% and 37.5%, respectively. In other words, by KSDE's own standards for 2015-2016, substantially more than one-half of our state's disabled

students—and more than one-third of our economically disadvantaged students—are not proficient in math.

During this same time frame KSDE reported the percentage for all students performing below grade level initially was 14.1% —with 26.3% in 2015-2016. To again state it starkly, Kansas still is failing to provide more than one-fourth of all its public school K-12 students with the basic skill of math. Both math and reading are core subjects for gaining sufficient training in the most basic requirements of an adequate education system. So this situation reflects, as the panel found based on the evidence, a failure to meet the sixth and seventh *Rose* standards. *Rose v. Council for Better Educ., Inc.*, 790 S.W.2d 186, 212 (Ky. 1989) ("[vi] sufficient training or preparation for advanced training in either academic or vocational fields so as to enable each child to choose and pursue life work intelligently; and [vii] sufficient levels of academic or vocational skills to enable public school students to compete favorably with their counterparts in surrounding states, in academics or in the job market").

The most recent KSDE test scores also reflect a continuing achievement gap between all students and subgroups. While some of the subgroups can have their own special achievement challenges, that again does not satisfactorily explain why today more than one-fourth of all students are not proficient in math; as we noted earlier, the panel held the fuller explanation lies in the lack of a school finance system reasonably calculated to meet the needs of all students. Multiplying the 2015-2016 math proficiency rate of 26.3% times that year's student population means that at a minimum 127,000 students were below proficient according to standards of that year. The achievement levels of the four plaintiff districts were not dissimilar from these.

As discussed below, the KSDE reports containing scores on Kansas standardized tests reveal that the proficiency percentages for subgroups—even when limited to specific grade—are not inconsistent with (1) the previously-mentioned KSDE scores for

69

"all grades" and (2) the panel's findings. Among other things, the reports demonstrate that an achievement gap persists. Unlike some other reports, these particular KSDE statistics do not categorize students who are disabled or participate in free and reduced lunch programs.

*KSDE testing of reading and math for only high school students from 2011-2012 to 2015-2016*

In reading, 26.4% of African American high school students initially scored below proficient in 2011-2012. KSDE reported this number as 50.7% for 2015-2016. In math, 34.5% scored below proficient in 2011-2012, and 62.5% in 2015-2016. In short, last school year more than one-half of our state's African American high school students were below proficient in reading, and nearly two-thirds were below proficient in math.

During this same 4-year period, 20.8% of Hispanic high school students initially scored below proficient in reading, and finally 44.1% did so. In math, KSDE reported the percentages below proficiency as 25.7% initially and 58.2% in the fourth year. So last school year nearly one-half of our state's Hispanic high school students were below proficient in reading, and substantially more than one-half were below proficient in math.

For ELL students, KSDE reported the percentage who scored below proficient in reading as 37% in the first year and 60.5% in the last year. In math, 35.3% initially scored below proficient, which moved to 68.1%. In other words, last school year more than one-half of our state's ELL high school students were below proficient in reading, and more than two-thirds were below proficient in math.

During these same years of testing the percentage for all high school students not meeting the KSDE reading standards for their grade that year initially was 10.6%—with 27.8% in 2015-2016. In math, KSDE reported percentages of 15.4% and 40.8%. Simply

put, less than 60% of all Kansas high school students are proficient in math. And an achievement gap between them and subgroups persists for those students who because of their age and grade in school have fewer years to eliminate such a gap.

*KSDE and NAEP testing of reading and math for 4th graders and 8th graders from 2011-2012 to 2015-2016*

The State points out that in the NAEP testing for 4th graders, Kansas was ranked 5th nationally for math and 10th for reading, while for 8th graders Kansas was ranked 6th for math and 16th for reading. The NAEP is not a Kansas-created achievement test. But the chart below demonstrates that achievement gaps for subgroups appearing in the results of K-12 KSDE testing in any given year—for all grades, and specifically for 4th and 8th graders—also appear in the NAEP results. Indeed, citing one year's NAEP results as an example, the panel made such a finding: "The achievement gap that exists between Kansas subgroups on state assessments, also appears in the NAEP results."

We must acknowledge the panel's finding that essentially recognized NAEP's approach to measuring student performance is not identical to the KSDE's. Among other things, the panel found that NAEP calculates the percentage of students who test below its standard of "basic." Additionally, the KSDE reports that the NAEP tests only samplings of students whereas the KSDE tests all students. Finally, the NAEP does not test annually and only tests several grades—typically the 4th and 8th because according to the NAEP they "represent critical junctures in academic achievement." Nevertheless, NAEP figures have value in our analysis of outcomes.

The chart discloses the percentage of students scoring "below proficient" on the KSDE academic testing and "below basic" on the NAEP academic testing by grade and year.

| KSDE 8th Grade ELA | 2011-2012 | 2012-2013 | 2014-2015 | 2015-2016 |
|---|---|---|---|---|
| *All Students* | 11.8% | 13.3% | 20.5% | 23.4% |
| African Americans | 27.2% | 28.0% | 40.2% | 44.1% |
| Hispanic | 21.1% | 24.2% | 32.0% | 34.0% |
| ELL | 29.7% | 33.5% | 39.3% | 41.2% |
| | | | | |
| KSDE 8th Grade Math | | | | |
| *All Students* | 15.2% | 22.2% | 36.8% | 40.1% |
| African Americans | 32.8% | 41.3% | 60.4% | 66.5% |
| Hispanic | 24.8% | 35.7% | 52.1% | 55.7% |
| ELL | 30.0% | 44.0% | 57.0% | 61.9% |
| | | | | |
| KSDE 4th Grade ELA | 2011-2012 | 2012-2013 | 2014-2015 | 2015-2016 |
| *All Students* | 11.6% | 14.3% | 11.0% | 13.8% |
| African Americans | 26.6% | 31.2% | 24.7% | 31.5% |
| Hispanic | 18.9% | 26.2% | 17.8% | 22.9% |
| ELL | 22.4% | 30.7% | 20.2% | 27.2% |
| | | | | |
| KSDE 4th Grade Math | | | | |
| *All Students* | 11.0% | 17.5% | 13.8% | 16.5% |
| African Americans | 26.7% | 35.9% | 30.1% | 38.4% |
| Hispanic | 16.3% | 28.9% | 21.7% | 26.4% |
| ELL | 17.8% | 32.5% | 24.0% | 30.0% |

| NAEP 8th Grade Reading | 2009 | 2015 |
|---|---|---|
| *All Students* | 20% | 21% |
| African Americans | 43% | 43% |
| Hispanic | 39% | 34% |
| ELL | 61% | 39% |
| | | |
| NAEP 8th Grade Math | | |
| *All Students* | 21% | 24% |
| African Americans | 48% | 46% |
| Hispanic | 35% | 35% |
| ELL | 52% | 45% |
| | | |
| NAEP 4th Grade Reading | 2009 | 2015 |
| *All Students* | 28% | 32% |
| African Americans | 44% | 56% |
| Hispanic | 45% | 46% |
| ELL | 53% | 55% |
| | | |
| NAEP 4th Grade Math | | |
| *All Students* | 11% | 17% |
| African Americans | 34% | 43% |
| Hispanic | 19% | 29% |
| ELL | 20% | 34% |

*Other outputs*

The State points to other outputs besides the NAEP results and KSDE results on Kansas' standardized testing. For example, Kansas ranks above average in the nation for ACT takers. But the panel found achievement gaps appearing in K-12 KSDE and NAEP testing also exist with the ACT.

*ACT*

We note the panel found ACT sets benchmarks to determine college readiness for several subjects commonly taken by first-year college students. The benchmarks represent the minimum ACT scores required for high school students to have a 75% chance of earning a C or better, or a 50% chance of receiving a B or better in the designated subject. While the panel found that in 2010 only 26% of Kansas high school

graduates met the ACT benchmarks in all four areas—English, math, reading, and science—the State argues this performance is comparable to other states.

But the 2010 ACT scores support the panel's finding that "the achievement gap is apparent by considering the number of students who meet the ACT Benchmarks." The panel found that in College Algebra, 51% of all Kansas students meet the ACT benchmark, while for African Americans the figure is 19%. The record reveals that for Hispanic students, this number is 31%. The panel also found that in College Biology, 34% of all Kansas students meet the benchmark but for African Americans the figure is 9%. According to the record, this figure is 16% for Hispanics. In English Composition, 79% of white students meet the benchmark; the figure is 52% for Hispanics, and the panel found the figure for African Americans is 40%. Unlike the KSDE, the ACT does not maintain data for ELL, disabled, and free and reduced lunch groups for comparative purposes.

*Graduation rates*

In pointing to high school graduation rates as outputs demonstrating constitutional adequacy, the State emphasizes they have improved in all groups and overall from 80.7% in 2010-2011 to 85.5% in 2013-2014. We judicially notice that this number was reported as 85.7% in 2014-2015. Plaintiffs respond that in 2010-2011, 24.8% of all Kansas students could not graduate in 5 years.

But as was shown with the scores of student proficiency testing such as KSDE, NAEP, and ACT, plaintiffs argue that a significant gap exists between all students and certain subgroups, even if the graduation rates for all students may have increased. In 2014-2015, only 14.3% of all students tracked were unable to graduate in 4 years, whereas 21.3% of Hispanic and African American students, 22.8% of ELL students and

73

those with disabilities, and 22.5% of students receiving free and reduced lunches were unable to do so.

*On track for college*

Beyond high school graduation rates, however, we observe that—as numerous experts testified at trial—in today's society, a college education is important to obtaining a competitive place in a modern economy. See *Gannon v. State*, 298 Kan. 1107, 1166, 319 P.3d 1196 (2014) (*Gannon I*) (*Rose* standards include "'(vi) *sufficient training or preparation for advanced training* in either academic or vocational fields so as to enable each child to choose and pursue life work intelligently; and (vii) *sufficient levels of academic or vocational skills* to enable public school students to compete favorably with their counterparts in surrounding states, in academics or in the job market. [Emphasis added.]'"). Accordingly, in 2014-2015, KSDE began to measure whether a student was performing at a level that was considered "on-track for college success."

The following chart shows the percentage of students considered on track by the KSDE during the 2014-2015 and 2015-16 school years according to grade and subgroup—and now including disabled and free and reduced lunch students. As the chart demonstrates, scores have changed from one year to the next. But what has not changed is the existence of an achievement gap between all students and all the subgroups.

Using high schoolers as an example, of "all students" tested in 2015-2016, 31.9% were on track to be college ready in ELA compared to 12.2% for African Americans and 6.2% for ELL students. For math, 24.2% were on track compared to 11.2% for both Hispanic and free and reduced lunch students. Per the chart, the gap between all students and the subgroups exists for eighth graders and fourth graders as well.

74

| ELA/Reading (% College Ready) | 4th Grade | | 8th Grade | | High School | |
|---|---|---|---|---|---|---|
| | 2014-2015 | 2015-2016 | 2014-2015 | 2015-2016 | 2014-2015 | 2015-2016 |
| All Students | 55.4% | 53.0% | 29.8% | 31.0% | 31.8% | 31.9% |
| African Americans | 32.4% | 26.0% | 12.8% | 12.0% | 12.3% | 12.2% |
| Hispanic | 37.4% | 36.0% | 14.6% | 16.7% | 16.4% | 16.7% |
| ELL | 31.5% | 29.2% | 8.5% | 9.9% | 5.6% | 6.2% |
| Disabled | 24.9% | 24.0% | 7.7% | 7.4% | 7.6% | 8.0% |
| Free & Reduced Lunch | 39.8% | 37.2% | 16.6% | 16.8% | 17.8% | 17.8% |
| | | | | | | |
| Math (% College Ready) | | | | | | |
| All Students | 35.8% | 37.4% | 23.0% | 25.7% | 24.7% | 24.2% |
| African Americans | 14.8% | 13.5% | 8.1% | 8.5% | 9.0% | 8.8% |
| Hispanic | 19.8% | 20.3% | 10.2% | 13.3% | 12.1% | 11.2% |
| ELL | 16.5% | 17.1% | 7.4% | 9.8% | 6.6% | 6.1% |
| Disabled | 14.4% | 15.4% | 4.4% | 5.2% | 4.0% | 4.3% |
| Free & Reduced Lunch | 21.8% | 22.8% | 11.2% | 12.7% | 12.0% | 11.2% |

We complete our outputs examination by concluding that, at a minimum, the results on various standardized tests reveal that an achievement gap, or proficiency gap, found by the panel to exist between "all students" and certain subgroups persists as of school year 2015-2016. And the numbers of all students failing to reach proficiency in core subjects each year continue to be significant.

The panel concluded that student achievement demonstrated CLASS's implementation was not reasonably calculated to meet the *Rose* standards—so CLASS was inadequate and unconstitutional. Based upon its finding that a correlation existed between funding and achievement, the panel determined the inadequacy was caused by underfunding. It based its determination in part upon the legislatively commissioned LPA study—whose mission included determining the amount of funds required to meet the standards then codified at K.S.A. 2005 Supp. 72-1127, which we found paralleled the *Rose* capacities—and who concluded that more funding was needed to meet them. As a result of this and other findings, the panel determined that more money was needed to make the inadequate CLASS legislation constitutional.

We agree, based upon the demonstrated inputs and outputs found by the panel and those contained in the updated standardized testing results which we have observed are not inconsistent with its findings. We independently conclude as a matter of law that through its implementation, CLASS is not reasonably calculated to have all Kansas K-12 public school students meet or exceed the *Rose* standards. See *Gannon I*, 298 Kan. at 1170 (constitutional inadequacy is a question of law). We reach this conclusion even if we consider the State's "record high levels" of funding from all sources during this time, *i.e.*, that which the panel either disallowed or heavily discounted.

This is an unfortunate conclusion to have to draw because the people of Kansas have emphasized the importance of public education since territorial days. "The Organic Act, an Act to Organize the Territory of Kansas § 34 (1854), and the Act for the Admission of Kansas Into the Union, § 3 (1861), included provisions providing that certain sections of land be reserved for educational purposes." *U.S.D. No. 229 v. State*, 256 Kan. 232, 239, 885 P.2d 1170 (1994). The ordinance to the constitution adopted by the Wyandotte Convention in July 1859 contained eight sections, three of which— sections 1, 6, and 7—dealt with establishing or supporting Common Schools.

The importance of public education to Kansans is further highlighted by its specific position as Article 6 in the people's constitution that was ratified by the electors of the state in October 1859 and became law upon the admission of Kansas into statehood in 1861. *U.S.D. No. 229*, 256 Kan. at 239. Article 6 is preceded only by the articles creating the three branches of government, elections, and suffrage—without which the three branches could not be populated. "[O]nce the branches are established and their seats filled, it appears education is the first thing on the agenda of the new state." *Montoy v. State*, 278 Kan. 769, 776I, 120 P.3d 306 (2005) (*Montoy II*) (Beier, J., concurring). So "[o]ur constitution not only explicitly provides for education; it implicitly places education first among the many critical tasks of state government." 278 Kan. at 776I (Beier, J., concurring).

76

The Kansas Legislative Council expressed much the same 40 years earlier when it stated that the propriety of an education article in a state constitution

"[I]s found in an historic precedent of the people's desire to speak on the subject. *The people wish to say something in their constitution concerning education because education is vital to their interests. Thus, by speaking in this fashion, the people secure to themselves what is of first importance* by placing binding responsibilities on the legislative, executive, and judiciary departments." (Emphasis added.) Kansas Legislative Council, *The Education Amendment to the Kansas Constitution*, p. 2 (Publication No. 256, December 1965).

This history and accompanying rationale have helped lead this court to previously conclude that for Kansans, children "'are our state's most valuable renewable resource.'" *Montoy v. State*, 279 Kan. 817, 845, 112 P.3d 923 (2005) (*Montoy III*) (quoting *Hoke Cty Bd. of Educ. v. State*, 358 N.C. 605, 616, 599 S.E.2d 365 [2004]).

## MISCELLANEOUS

*The plaintiffs are not entitled to attorney fees.*

In the plaintiffs' initial brief submitted on the issue of adequacy, they requested this court award them attorney fees. We reject this request for the same reason we rejected their similar request during the equity phase of this case as discussed in our *Gannon II* and *III* opinions.

The plaintiffs and the State have indicated a motion for attorney fees is currently pending before the panel. We observe nothing in the record demonstrating the panel has ruled on such a motion or that the plaintiffs have cross-appealed any decision on such a motion.

As we held in *Gannon II* and *III*, requests for attorney fees raised for the first time in an appellate court must be made by motion according to Supreme Court Rule 7.07(b) (2017 Kan. S. Ct. R. 50). *Gannon v. State*, 303 Kan. 682, 733-34, 368 P.3d 1024 (2016) (*Gannon II*); *Gannon v. State*, 304 Kan. 490, 517, 372 P.3d 1181 (2016) (*Gannon III*). The plaintiffs have not submitted such a motion. Accordingly, their request for attorney fees is procedurally insufficient and will not be considered. *Gannon II*, 303 Kan. at 733-34 (merits of plaintiffs' motion for attorney fees raised for the first time on appeal would not be considered where request did not conform to Supreme Court Rule 7.07).

We have considered the parties' other arguments and conclude they have no merit or are now moot.

*Remedies*

Although the panel declared CLASS failed the *Gannon* test, it did not implement any specific order requiring increases in state spending on K-12 education. But it did thoroughly review expert opinion, including the findings from the 2006 LPA cost study that was commissioned by the State to develop an estimate of what would be required to bring the state into compliance with Article 6.

After reviewing the results of these studies and other trial evidence, the panel concluded that a BSAPP amount near $4,654 might satisfy the Article 6 requirements—if the weightings included in the state financial aid formula were increased to align with at least the weightings suggested by the LPA study's consultant. It also determined that at least a $4,980 BSAPP was required if LOB funds continued to be used, in part, to satisfy Article 6. But as the State points out, for these BSAPP amounts the panel noted that both the LPA and A & M studies arrived at their estimates of required funding by assuming the desired education was funded *exclusively* through state financial aid, *i.e.*, through

78

BSAPP and its attendant calculations—not counting federal funds and funds they could raise from LOB. So the panel's guidance is not complete.

We observe that for the issue of equity the State previously asked that our remedy, if any, "should be limited to a declaratory judgment giving the legislature an opportunity to cure any constitutional violations on its own." *Gannon II*, 303 Kan. at 734. In its briefs and at oral arguments, the State renews that particular request on the issue of adequacy, stating that if an adequacy violation is found, this court "should follow the same basic approach as the Panel—*i.e.*, issue a declaratory judgment with guidance for the Legislature while at the same time allowing the Legislature both the flexibility and an opportunity to revise the school finance system."

This request is consistent with what we said in *Gannon III*:

"[W]e do not dictate to the legislature how it should constitutionally fund K-12 public school education; we only review its efforts to ensure they do not run afoul of the Kansas Constitution. See *Gannon II*, 303 Kan. at 734-35. ("We . . . reaffirm[] the legislature's power and duty to create a school funding system. . . . [W]e have also consistently affirmed our own power and duty to review legislative enactments for constitutional compliance.)." 304 Kan. at 500-01.

There is no one specific way for this funding to be achieved. So we must part company with the panel insofar as it would limit the State to any specific system or structure, such as the former SDFQPA, or refuse to consider funding other than calculated through the BSAPP, such as local revenue sources like the LOB, KPERS, and federal funds—for purposes of evaluating adequacy.

Our adequacy test, as described in *Gannon I*, rejects any litmus test that relies on specific funding levels to reach constitutional compliance. 298 Kan. at 1170 ("[E]ven if a legislature had not considered actual costs, a constitutionally adequate education

79

nevertheless could have been provided—albeit perhaps accidentally . . . ."). And we acknowledge that the estimates of the various cost studies are just that: estimates. But they do represent evaluations that we cannot simply disregard. 298 Kan. at 1170 ("[A]ctual costs remain a valid factor to be considered during application of our test for determining constitutional adequacy under Article 6."). Accordingly, the State should not ignore them in creating a remedy.

We have previously held that "total spending is not the touchstone of adequacy." *Gannon I*, 298 Kan. at 1172. So we reiterate that the legislature should focus instead on creating a public education financing system for grades K-12 that—through structure and implementation—is reasonably calculated to have all Kansas public education students meet or exceed the standards set out in *Rose* and as presently codified in K.S.A. 2016 Supp. 72-1127. See 298 Kan. at 1172. While considering cures, the legislature should also be mindful of the connection between equity and adequacy. 298 Kan. at 1199-1200 (explaining that although adequacy and equity are distinct components of Article 6, they do not exist in isolation from each other, so that a particular cure of equity infirmities may affect adequacy of the overall education funding system). See also *Gannon II*, 303 Kan. at 743 ("[A]ny other funding system it enacts must be demonstrated to be capable of meeting the equity requirements of Article 6—while not running afoul of the adequacy requirement.").

It also must be emphasized that our *Gannon I* test for adequacy is one of minimal standards. *Gannon I*, 298 Kan. at 1170. Accordingly, once they have been satisfied, Article 6 has been satisfied. See 298 Kan. at 1167. Whether the legislature satisfies the test by exceeding the *Rose* standards is up to that deliberative body—and ultimately, the people of Kansas who elect its members to office. See 298 Kan. 1158-61 (recognizing that under Kansas Constitution many entities play roles in public education in Kansas and describing their roles and interplay).

80

According to several high level public officials whose statements appear in the record on appeal, the 2015 legislature essentially designed CLASS to freeze the status quo to give itself 2 years to design and pass a replacement to the SDFQPA. Consistent with those statements, the legislature set CLASS to expire on June 30, 2017. It is therefore appropriate to continue our practice in this case of retaining jurisdiction and staying the issuance of our mandate to give the legislature the full extent of the opportunity it created with its own 2-years-plus deadline to craft a system of school funding that comports with the constitution. *Gannon I*, 298 Kan. at 1198-99 (on March 7, 2014, remanding to panel for enforcement of affirmed equity rulings and allowing legislature a reasonable time—by June 30 [approximately 110 days]—to cure the constitutional deficiencies before the panel took action); *Gannon II*, 303 Kan. at 743 (on February 11, 2016, staying issuance of mandate to give legislature a second, and substantial, opportunity to craft a constitutionally suitable solution and minimize threat of disruptions in funding for education; retaining jurisdiction of equity question and requiring legislative cure by end of fiscal year:  June 30); *Gannon III*, 304 Kan. at 527-28 (on May 27, 2016, holding legislative action did not cure inequities found confirmed to exist in *Gannon II*, and continuing stay of mandate to afford legislature yet another opportunity—until June 30—"to craft a constitutionally suitable solution").

Although we stay the issuance of today's mandate, we reiterate that any system of school finance created by the legislature must comply with the Kansas Constitution. The constitution is "the work . . . of the people," *Anderson v. Cloud County*, 77 Kan. 721, 732, 95 P. 583 (1908), and "is the supreme and paramount law, receiving its force from the express will of the people." *Moore v. Shanahan*, 207 Kan. 645, 651, 486 P.2d 506 (1971). And according to the people's constitution, the judiciary has the sole authority to determine whether an act of the legislature conforms to their supreme will, *i.e.*, is constitutional. *Atkinson v. Woodmansee*, 68 Kan. 71, 75, 74 P. 640 (1903) ("The constitution is the direct mandate of the people themselves. The statute is an expression of the will of the legislature. Which shall this court obey?"). Quoting from the United

81

States Supreme Court's decision in *Marbury v. Madison*, 5 U.S. [1 Cranch] 137, 177, 2 L. Ed. 60 (1803), the *Atkinson* court ultimately concluded that it must obey the will of the people as expressed in their constitution. See *Gannon II*, 303 Kan. at 736.

So if by June 30, 2017, the State has not satisfactorily demonstrated to this court that any K-12 public education financing system the legislature enacts is capable of meeting the adequacy requirements of Article 6, then a lifting of the stay of today's mandate will mean that the state's education financing system is constitutionally invalid and therefore void. See *Gannon II*, 303 Kan. at 743-44. See also *Gannon I*, 298 Kan. at 1167 ("""an act of the Legislature repugnant to the constitution is void""") (quoting *Marbury v. Madison*, 5 U.S. [1 Cranch] at 177); *Atkinson*, 68 Kan. at 82 (citing Federalist Paper No. 78 of 1788 to state no legislative act contrary to the constitution can be valid). *Marbury* itself declared that "[a]n act of congress, repugnant to the constitution, cannot become a law." 5 U.S. [1 Cranch] 137.

We recognize the legislature has twice demonstrated its ability to cure constitutional infirmities recognized by this court in the state's K-12 school finance system. See *Montoy v. State*, 282 Kan. 9, 24-25, 138 P.3d 755 (2006) (*Montoy IV*) (legislature's efforts in 2005 and 2006 constitute substantial compliance with prior orders; appeal dismissed); Sup. Ct. Order, Case No. 113,267 (June 28, 2016) (finding legislation cured equity constitutional infirmities in *Gannon* litigation).

This history, coupled with CLASS's long-scheduled expiration on June 30, 2017, promotes confidence that the State can reach compliance with the adequacy requirements of Article 6 by that date, *i.e.*, the end of the 2016-2017 school year. As the State itself argues, "because the CLASS Act expires on June 30, 2017, the Legislature likely will be adopting a significantly revised or altogether new school finance system during the 2017 legislative session in any event." Indeed, several times in *Gannon III* we acknowledged the legislature's intent to comply with constitutional equity requirements as expressed in

its preamble to its recent legislation: "'The legislature is committed to avoiding any disruption to public education and desires to meet its obligation.'" 304 Kan. at 525-27.

The panel's conclusion of CLASS's unconstitutionality is affirmed. Our order of June 30, 2015, staying the panel's order remains in effect until further determination by this court. We retain jurisdiction over the State's appeal and stay the issuance of today's mandate through June 30, 2017.

Affirmed.

BEIER and STEGALL, JJ., not participating.

MICHAEL J. MALONE and DAVID L. STUTZMAN, Senior Judges, assigned.[1]

---

[1]**REPORTER'S NOTE:** Senior Judge Malone was appointed to hear case No. 113,267 vice Justice Stegall under the authority vested in the Supreme Court by K.S.A. 20-2616, and Senior Judge Stutzman was appointed to hear the same case vice Justice Beier under the authority vested in the Supreme Court by K.S.A. 20-2616.